No. 3525

Second Circuit

THIBODAUX v. THE SISTERS OF CHARITY OF THE INCARNATE WORD

——

(July 1, 1929.  Opinion and Decree.)
(October 1, 1929.  Rehearing Refused.)

——

Blanchard, Goldstein and Walker, of Shreveport, attorneys for plaintiff, appellant.

Wilkinson, Lewis & Wilkinson, of Shreveport, attorneys for defendant, appellee.

REYNOLDS, J.  We take from appellant's brief the following concise statement of the nature of the case:

This is an action for damages brought by the plaintiff, Paul T. Thibodaux, in behalf of his minor child, Letty May Thibodaux, against the Sisters of Charity of the Incarnate Word, a corporation domiciled at Shreveport, La., conducting a hospital commonly known as "The T. E. Schumpert Memorial Sanitarium."

The injuries complained of resulted from burns received by the child, Letty May Thibodaux, at the time of her birth when she was placed in a basket prepared by the employees of the sanitarium, which contained a scalding hot water bottle.

Only one defense is urged.  The defendant asserts that it is a charitable institution, and, as such, not liable in an action for damages, where the asserted liability is based upon an application of the rule respondeat superior.

There are, consequently, two questions presented: First, whether or not the defendant is in legal contemplation a charitable institution; and, second, whether or not in this state such corporations are ex-

empt from liability in actions arising under the rule referred to.

Plaintiff has appealed from a judgment rejecting his demands.

Are such institutions as defendant charitable institutions within the legal meaning of this term, and, if so, are they exempt from liability for damage caused patients by the negligence of their servants?

Different courts, viewing the questions from different angles, have decided them both ways.

In Hearns vs. Waterbury Hospital, 66 Conn. 98, 33 A. 595, 31 L. R. A. 224, the court said:

"This defendant does not come within the main reason for the rule of public policy which supports the doctrine of respondeat superior. It derives no benefit from what its servant does, in the sense of that personal and private gain which was the real reason for the rule. Again, so far as the persons injured are concerned, especially if they be patients at the hospital, the defendant does not 'set the whole thing in motion,' in the sense in which that phrase is used as expressing a reason for the rule. Such patient, who may be injured by the wrongful act of a hospital servant, is not a mere third party, a stranger to the transaction. He is rather a participant. The thing about which the servants are employed is the healing of the sick. This is set in motion, not for the benefit of the defendant, but of the public. Surely, those who accept the benefit, contributing also by their payments to the public enterprise, and not to the private pocket of the defendant, assist as truly as the defendant in setting the whole thing in motion. But the practical ground on which the rule is based is simply this: On the whole, substantial justice is best served by making a master responsible for the injuries caused by his servant acting in his service, when set to work by him to prosecute his private ends, with the expectation of deriving from that work private benefit. This has at times proved

a hard rule, but it rests upon a public policy too firmly settled to be questioned. We are now asked to apply this rule, for the first time, to a class of masters distinct from all others, and who do not and cannot come within the reason of the rule. In other words, we are asked to extend the rule, and to declare a new public policy, and say: On the whole, substantial justice is best served by making the owners of a public charity, involving no private profit, responsible, not only for their own wrongful negligence, but also for the wrongful negligence of the servants they employ only for a public use and a public benefit. We think the law does not justify such an extension of the rule of respondeat superior. It is, perhaps, immaterial whether we say the public policy which supports the doctrine of respondeat superior does not justify such extension of the rule, or say that the public policy which encourages enterprises for charitable purposes requires an exemption from the operation of a rule based on legal fiction, and which, as applied to the owners of such enterprises, is clearly opposed to substantial justice. It is enough that a charitable corporation like the defendant, whatever may be the principle that controls its liability for corporate neglect in the performance of a corporate duty, is not liable, on grounds of public policy, for injuries caused by personal wrongful neglect in the performance of his duty by a servant whom it has selected with due care; but in such case the servant is alone responsible for his own wrong. This result is justified by the opinions in Hall vs. Smith (2 Bing. 156); Holliday vs. St. Leonard's (11 C. B. (N. S.) 192); and Railway Co. vs. Artist ((C. C. A.) 60 F. 365, 23 L. R. A. 581), supra, substantially on the grounds above stated, and is reached, for one reason or another, by the greater number of courts that have dealt with this particular liability of a corporation for public or charitable purposes."

And the United States Circuit Court of Appeals in the case of Powers vs. Massachusetts Homeopathic Hospital, 109 F. 294 65 L. R. A. 372, said:

"The plaintiff was what is sometimes called a 'paying patient' the rate of her payment being $14 a week. Upon this ground her counsel has sought to distinguish her case from that of a patient in the hospital who pays nothing. In our opinion, the difference is immaterial. As has been said, the defendant was a charitable corporation; that is, a corporation organized exclusively for charity. That the ministrations of such a hospital should be confined exclusively to the indigent is not usual or desirable. Those of moderate means from necessity, and not a few rich people from choice, resort to great charitable hospitals for treatment, especially in surgical cases. Throughout the world this is the custom in these institutions, whether they are maintained by individual, religious, or municipal charity. From patients who are not indigent, a payment is commonly permitted or required. Commonly, and in the case at bar quite manifestly, this payment does not make full pecuniary compensation for the services rendered. Those who make a considerable payment not infrequently receive in some respects a more expensive service than do those who make a small payment or none at all; but the payment required is usually calculated upon the patient's ability to pay, rather than upon the whole cost of the treatment he receives. That this was the defendant's rule appears plainly from its printed form of application, which it required all applicants to fill out alike, whether they paid something or nothing. In this form the inquiry concerning payment was stated as follows: 'How much per week applicant can pay,'— thus indicating that the amount of the contribution was to be determined, not by the value or cost of the service rendered, but by the ability of the patient to aid the charitable purposes of the hospital. In our opinion, a paying patient in the defendant hospital, as well as a nonpaying patient, seeks and receives the services of a public charity.

"That such a hospital in its treatment of a rich patient shall be held to a greater degree of care than in its treatment of a pauper is not to be tolerated. Certain luxuries may be given the former which the latter does not get, and this for va-rious reasons; but the degree of protection from unskilled and careless nurses must be the same in both cases. Again, it would be absurd to make the defendant's liability for an accident, like that here alleged, depend upon the payment of that insignificant proportion of the cost of the service rendered which in some cases may properly be required from a poor man or woman. We are of opinion that this case stands as if the plaintiff had been admitted without any payment whatsoever.

"We have to determine, then, if a patient admitted to a hospital maintained for charity can recover judgment against that hospital for injuries caused by the negligence of a nurse employed therein. There is a great weight of authority in favor of the defendant in the case put, but the courts have differed so widely in their reasoning that a somewhat extended examination is necessary, both of the cases decided and of the principles upon which they rest. The liability of the defendant for which the plaintiff contends is the liability of a master for the torts of his servant. 'The master is answerable for every such wrong of the servant or agent as is committed in the course of the service and for the master's benefit, though no express end or profit of the master be proved.' * * *

"One who accepts the benefit either of a public or of a private charity enters into a relation which exempts his benefactor from liability for the negligence of his servants in administering the charity; at any rate, if the benefactor has used due care in selecting those servants. To paraphrase the illustration put by the learned judge before whom this case was tried, it would be intolerable that a good Samaritan, who takes to his home a wounded stranger for surgical care, should be held personally liable for the negligence of his servant in caring for that stranger. Were the heart and means of that Samaritan so large that he was able, not only to provide for one wounded man, but to establish a hospital for the care of a thousand, it would be no less intolerable that he should be held personally liable for the negligence of his servant in caring for any one of those thousand wounded men. We cannot perceive that the position of the defendant differs from the

case supposed. The persons whose money has established this hospital are good Samaritans, perhaps giving less of personal devotion than did he, but, by combining their liberality, thus enabled to deal with suffering on a larger scale. If, in their dealings with their property appropriated to charity, they create a nuisance by themselves or by their servants, if they dig pitfalls in their grounds and the like, there are strong reasons for holding them liable to outsiders, like any other individual or corporation. The purity of their aims may not justify their torts; but, if a suffering man avails himself of their charity, he takes the risks of malpractice, if their charitable agents have been carefully selected.

"We have thus indicated the grounds upon which rests, in our opinion, the defendant's exemption from liability in this case. Though we feel constrained to differ from the reasoning followed by some other courts in reaching the same conclusion, we are not unmindful that the identity of conclusion reached, though by different roads, is a strong proof of its correctness. Doubtless a weight of authority is more overwhelming if it is identical in reasoning as well as in result, but identity of result is in itself no mean argument for its justice."

And this is the conclusion reached by our own court on the question.

We held, in Foye vs. St. Francis Sanitarium & Training School for Nurses, 2 La. App. 307, that a charity hospital is not liable to a patient, either pay or charity, for injuries suffered through the negligence of a nurse, where the nurse was selected with due care.

And in Demien vs. Young Men's Christian Association, No. 7965 on the docket of the Orleans Court of Appeal (see So. Rep. Dig.), that court held that institutions which furnish hospital accommodations and medical attention to different classes of patients, some for pay and others free of charge, not, however, for making money or profit, but for benevolent and charitable purposes exclusively, and whose entire receipts and revenues are devoted to such purposes, are not liable even to pay patients for the errors or negligent acts of competent nurses furnished by them to their patients, while such nurses are in the operating room, assisting the surgeon and under his orders.

And the same court reached the same result in the case of John Jordan vs. Touro Infirmary & Hebrew Benevolent Association (No. 135,097 on its docket) 123 So. —.

And the Supreme Court of Louisiana, on January 30, 1923, denied a writ of review in the case, simply stating: "Refused. The decree is correct."

Counsel for plaintiff call our attention to Act No. 254 of 1914, and argue that it subjects nontrading corporations to the same liabilities as business corporations. We cannot concur in this view.

We do not think the title of the act sufficiently broad to warrant so holding, and, if it were, we do not think it was the intention of the Legislature to abrogate the general rule of law exempting charitable institutions from liability for injuries suffered by patients from the negligence of nurses selected with due care.

Besides this, the Louisiana cases cited by us in support of the doctrine of nonliability under the circumstances were decided since that act was passed, and, the doctrine having been approved by the Supreme Court of Louisiana, in its refusal of the writ of review referred to, the rule of stare decisis must be deemed applicable to the question.

On the issue of whether or not the defendant is a charitable institution, the evi-

dence, in our opinion, leaves no doubt that it is.

Dr. J. C. Willis, a surgeon, who operated on patients in the defendant institution as well as in other hospitals, was asked how defendant's charges for services, compared with those of another named hospital, and he answered:

"Well, I don't know; I could not say, because I am not familiar with what their charter requires or calls for; I will say this: I never asked them in my life to do a charitable case but that they did it willingly and cheerfully.
"Q. When specially requested to do charitable work?
"A. Yes."

Sister Baptista testified:

"Q. What connection have you with the Sisters of Charity of the Incarnate Word, T. E. Schumpert Sanitarium?
"A. At the present time I am Sister Superior in charge; superintendent.
"Q. Do you know whether or not the Schumpert Sanitarium pays any taxes?
"A. No.
"Q. Have you ever paid any dividends?
"A. No.
"Q. Has any capital stock ever been issued?
"A. No.
"Q. What was the concern incorporated for?
"A. Solely for the care of the sick."

She further testified:

"Well, patients who are able to pay, they pay for their rooms, whatever price room they wish to have; and patients not able to pay, we accept them as charity; take care of them."

Asked:

"Sister, what do you do with any funds that you have, if your revenues exceed your current expenses—what do you do with the rest?"

She answered:

"Well, we have to improve and renovate the hospital; put up additional buildings; similar institutions."

She further testified:

"Q. Now has the Schumpert Sanitarium, the Sisters of the Incarnate Word, have they ever contributed anything for the construction of any other institution?
"A. They never have had any means so far."

She also testified that all work necessary to be done in connection with the operation of the hospital was performed by the sisters, and that all they received for their services was their board, lodging and clothing.

As to the qualification of the nurses whose negligence is alleged to have caused the injuries to plaintiff's child, she testified that Miss Omie Aurora Rambin was at the time a student nurse in her third year of study, and that Sister Lelia was a registered nurse under the laws of Louisiana, and that they were both competent.

Sister Claver testified that during the five years 1923-1928, the hospital had rendered medical service without charge to charity patients which, if charged for at current rates for such services to pay patients, would have amounted to $33,-247.11. And that:

"Q. In addition to the charity work shown by that statement, do you serve meals to the poor?
"A. We do.
"Q. About how many do you average a month?
"A. About a hundred and fifty meals a month.
"Q. Do you get any compensation for those meals at all?
"A. None, whatever."

Mrs. J. H. Howell testified that she was matron of the Genevieve Orphanage in

Shreveport, La., a charitable institution, and:

"Q. Do you send patients from the Genevieve Orphanage to the Shreveport Sanitarium?
"A. We do.
"Q. How long have you been doing that?
"A. Ever since they opened the sanitarium in Margaret place. * * *
"Q. Is there ever any question about pay for any patient you send there?
"A. No. I have asked for statements. They said they make none.
"Q. What do you mean by that?
"A. They never send us any statements for taking the child and keeping it until the child is well and then sent to our home well."

John W. A. Jeter testified that he was assessor of Caddo parish, and that defendant's property was not assessed for taxation, because it was a charitable institution, and so exempt from taxation.

The defendant corporation was chartered under the laws of the State of Louisiana on June 5, 1913, for the declared purpose that:

"This corporation is formed and its objects are hereby declared to be to hold and administer the property acquired by it under the donation inter vivos from the late Dr. John I. Schumpert as hereinbefore described, and conducting the same as a sanitarium for the treatment of the sick and diseased, as well as conducting therein a training school for nurses and granting and giving to them diplomas or certificates of merit, and to receive and hold any other property that they may acquire by any means, and to administer the same under such terms and conditions as may be required or may seem necessary."

The corporation has no capital stock, and declares no dividends. The property belongs to the incorporators, who receive no pay for their services and devote their lives to the relief of the afflicted.

In McDonald vs. Massachusetts General Hospital, 120 Mass. 432, 21 Am. Rep. 529, considering what constituted a public charity, the court said:

"The corporation has no capital stock, no provision for making dividends or profits, and whatever it may receive from any source it holds in trust to be devoted to the object of sustaining the hospital and increasing its benefit to the public, by extending or improving its accommodations and diminishing its expenses. Its funds are derived mainly from public and private charity; its affairs are conducted for a great public purpose, that of administering to the comfort of the sick, without any expectation, on the part of those immediately interested in the corporation, of receiving any compensation which will inure to their own benefit, and without any right to receive such compensation. This establishes its character as a public charity."

The defendant clearly comes within this definition of a charitable institution.

Being a charitable institution, and the nurses whose negligence is complained of having been selected with due care, the defendant was not liable to plaintiff for the injuries to his child complained of.

The judgment appealed from is therefore correct, and accordingly it is affirmed.