Mrs. Mary Jurjevich, widow of John M. Anticich, on her own account and as tutrix of the minors, Anna Marguerite Anticich, Andrew Roy Anticich and Louis Henry Burns Anticich, brought this suit against the Hotel Dieu claiming an aggregate of $15,000 as damages due to the death of John M. Anticich, said to have been caused by the mistreatment given Anticich while a patient in the Hotel Dieu by its superintendent and other employees. The petition alleges that Captain John M. Anticich was admitted to the Hotel Dieu on Saturday afternoon, July 12, 1941, suffering from the results of a gunshot wound in his right chest; that for a period of nine days thereafter Captain Anticich appeared to respond to the treatment prescribed by his private physician, Dr. P.B. Salatich; that shortly after noon on July 21, 1941, Dr. Salatich removed a quantity of blood which had accumulated in the patient's chest; that about 2 p.m. on the same day the patient became delirious "whereupon Sister Agatha, a member of the Defendant Corporation and of the Society of the Daughters of Charity of St. Vincent DePaul, who was in charge of the hospital at the time, disregarding the physician's instructions as to administering a sedative, called First Precinct Police Station stating that there was a crazy man at large in the hospital, endangering the lives and safety of other patients, which was an exaggerated statement of the conditions, and asked for assistance in subduing him"; that in response to the telephone call four or five policemen repaired to the Hotel Dieu and forcibly replaced Captain Anticich in his bed and shackled his ankles and handcuffed his wrists in compliance with a request of Sister Agatha; that he was placed on the floor of a police van, clad only in his hospital nightgown in an extremely weakened condition and perspiring profusely; that he was conveyed to the City Hospital for Mental Diseases and upon arriving there was placed on a wooden bench in the office of the Superintendent while an argument was in progress over his admission to the hospital; that he was finally rejected by the hospital for Mental Diseases and after repeated attempts to obtain accommodations at the other hospitals, was sent to the Charity Hospital in an ambulance where he died fifteen minutes later; that the death of Captain Anticich, which occurred at about 7:20 p.m. on the evening of July 21, 1941, at the Charity Hospital, was directly caused by the "reckless and wanton ill-treatment to which he was subjected on the orders and under the supervision of the said Sister Agatha, who was acting in (within) the scope of her duties as Superintendent of the defendant corporation".
The defendant filed exceptions of no right and of no cause of action which were overruled. It then answered admitting the salient facts as alleged in the petition, but denied that it had mistreated Captain Anticich, averring that what it had done in connection with his removal was necessary because of the violence of Captain Anticich, who could not be subdued by nurses, orderlies and internes of the Institution; that he threatened all those who attempted to approach him with bodily harm and actually stabbed one of the internes in the abdomen with an "infusion needle", which had been inserted in his side under the direction of Dr. Salatich. Finally, defendant averred in the alternative what it had relied upon in support of its exceptions of no cause and of no right of action, that if the agents and employees of the defendant may be said to be guilty of any negligence or wrongdoing, it is not responsible therefor, because it is a non-profit corporation, wholly charitable in its purpose, consequently, under the jurisprudence of this state, it is not liable for the wrongful acts of its employees and servants unless it had been careless or negligent in their selection or employment and that all members of its staff had been chosen with great care and after thorough examination and that, so far as Sister Agatha is concerned, she has had seventeen years of *Page 634 
hospital experience and has been connected with Hotel Dieu for the past six years.
There was judgment in favor of plaintiff as follows: $3,000 to the widow in her individual capacity, and as tutrix of her minor children $4,500 or $1,500 each a total of $7,500. The defendant has appealed and Mrs. Anticich has answered the appeal asking that the award be increased to the sum prayed for.
Considering the question first presented by the exception of no right and of no cause of action and later in defendant's answer to the effect that defendant is not liable for the results of the negligence or wrongdoing of its employees, if such employees were selected with due care, we find that there is no proof in the record and apparently no contention that the defendant was guilty of carelessness in the selection of its employees.
The next question presented is whether the defendant hospital is, in fact, a charitable institution. According to its charter, which is in evidence, it is operated by the members of the "Society of the Daughters of Charity of St. Vincent DePaul" and that it is "formed only for purposes of public utility and Charity, without any intention of speculation or individual benefit". Its objects and purposes are declared to be to "carry on and operate a Hospital for the care and treatment of the sick; whether rich or poor, and in connection therewith to give instructions, clinical and didactical, to Young Students of Trained nursing, including the issuing of diplomas therefor; and generally to do and perform any and all acts and things necessary and incidental to the proper operation and maintenance of said Hospital and said training school for nurses, all subject to such rules and regulations as the Board of Directors of the corporation may, from time to time, prescribe".
Sister Boniface, defendant's treasurer, testified that the value of its free services during the past four years was as follows:
"1938 $48,607.13 1939 61,000.00 1940 54,000.00 1941 58,000.00"
There are many pay patients and the amount of receipts from these patients are not detailed. Captain Anticich was one of the pay patients. It may be that the pay patients outnumber the charity patients, we have no information on that subject. However, according to the record no profit is made, the receipts from the pay patients being used to maintain and improve the service and facilities of the hospital.
In Jordan v. Touro Infirmary and the Hebrew Benevolent Association, La.App., 123 So. 726, 731, decided by this Court in 1922, we said:
"The answer to the argument advanced by plaintiff that the hospital fees received by the Touro from pay patients produce a profit and thereby destroy the character of the Touro as a charitable institution, at least, in so far as pay patients are concerned, is found in Pearson v. Arkansas Midland R. Co.,106 Ark. 442, 153 S.W. 595. The court said:
"`The fact that there is a surplus on hand, which could be put out at interest, does not constitute such benefit as would change the character of the defendant's relation to its employees in the operation of the hospital. In accumulating the fund, and also in caring for the surplus, the railroad company is merely acting as trustee for its employees, and it is its duty to keep the fund, unless it becomes advisable to invest the surplus in some way.' See, also, 2 Cooley on Torts, p. 1011-1013; Hearns v. Waterbury Hospital, 66 Conn. 98, 33 A. 595, 31 L.R.A. 224; Jensen v. Maine Eye Ear Infirmary, 107 Me. 408, 78 A. 898, 33 L.R.A., N.S., 141; Fire Ins. Patrol v. Boyd, 120 Pa. 624, 15 A. 553, 1 L.R.A. 417, 6 Am.St.Rep. 745; Emery v. Jewish Hospital Ass'n, 193 Ky. 400, 236 S.W. 577; Burdell v. St. Luke's Hospital, 37 Cal.App. 310,173 P. 1008; McDonald v. Massachusetts General Hospital,120 Mass. 432, 21 Am.Rep. 529; Downs v. Harper Hospital, 101 Mich. 555, 60 N.W. 42, 25 L.R.A. 602, 45 Am.St.Rep. 427; Pepke v. Grace Hospital, 130 Mich. 493, 90 N.W. 278; Duncan v. Nebraska Sanitarium Benev. Ass'n., 92 Neb. 162, 137 N.W. 1120, 41 L.R.A., N.S., 973, Ann.Cas.1913E, 1127; Cunningham v. Sheltering Arms, 135 App. Div. 178, 119 N.Y.S. 1033; Adams v. University Hospital, 122 Mo.App. 675, 99 S.W. 453; Taylor v. Protestant Hospital Ass'n, 85 Ohio St. 90, 96 N.E. 1089, 39 L.R.A., N.S., 427; Gable v. Sisters of St. Francis, 227 Pa. 254, 75 A. 1087, 136 Am.St.Rep. 879; Bishop Randall Hospital v. Hartley, 24 Wyo. 408, 160 P. 385, Ann.Cas.1918E, 1172; Magnuson v. Swedish Hospital, 99 Wn. 399, 169 P. 828; Powers v. Massachusetts *Page 635 
Homeopathic Hospital [1 Cir.] 109 F. 294, 65 L.R.A. 372, writ refused 183 U.S. 695, 22 S.Ct. 932, 46 L.Ed. 394.
"In opposition to these cases, the plaintiff quotes the cases in Meyer v. McNutt Hospital, 173 Cal. 156, 159 P. 436; Glavin v. Rhode Island Hospital, 12 R.I. 411, 34 Am.Rep. 675; Stewart v. California Medical M. B. Ass'n, 178 Cal. 418, 176 P. 46; Mulliner v. Evangelischer Diakonniessenverein, etc., 144 Minn. 392, 175 N.W. 699, and especially the case of Tucker v. Mobile Infirmary Ass'n, 191 Ala. 572, 68 So. 4, L.R.A.1915D, 1167. But, as said by our own Supreme Court, we find the great weight of authority opposed to the views expressed in the Tucker case by the Alabama court."
The Court of Appeal for the Second Circuit in Thibodaux v. Sisters of Charity of the Incarnate Word, 11 La.App. 423, 123 So. 466, 470, held that the father of an infant who, at the time of her birth, was placed in a basket which contained a scalding hot water bottle, by employees of the hospital, could not recover under the doctrine of respondeat superior for the injuries sustained by the infant, because the defendant institution was a charitable institution and the nurse "whose negligence is complained of having been selected with due care, the defendant was not liable to plaintiff for the injuries to his child".
In Demien v. Young Men's Christian Association, No. 7965 of the docket of this court, decided in 1923 (not reported), it was said in the syllabus written by the court that: "Institutions which furnish hospital accomodations and medical attendance to different classes of patients, some for pay and others free of charge, not however for making money or profit, but for benevolent and charitable purposes exclusively and whose entire receipts and revenues are devoted to such purposes, are not liable even to pay patients, for the errors or negligent acts of competent nurses furnished by them to their patients, while such nurses are in the operating room, assisting the surgeon and under his orders".
In Bougon v. Volunteers of America, et al., La.App., 151 So. 797, 799, after recognizing that our courts have upheld the doctrine of immunity of charitable institutions from the effects of the delicts or wrongs of their employees, held that this doctrine did not apply to third persons, saying:
"But there is no case in Louisiana which has extended the doctrine of the Jordan case so as to grant immunity to charitable corporations for the torts of their employees causing injuries to third persons, and, while there are a number of other jurisdictions in which the `Trust Fund Doctrine' has been so extended, the clear weight of authority elsewhere is to the contrary. In 5 R.C.L. pp. 377-379, verbo `Charities,' §§ 122 and 123, we read the following:
"`It is true that many of the courts have declared generally that those administering a trust fund are not responsible for the torts of their agents, because damages for such torts cannot be paid from the trust fund. That statement was first made in an early case in the House of Lords of England, but was afterwards declared incorrect by the same tribunal. It has been constantly repeated in many jurisdictions and has been used as the basis of some discussions. But a rule that a charitable corporation is exempt from liability for the negligence of its servants, resulting in injuries to strangers, must rest upon the argument that the advantages reaped by the public from such trusts justify the exemption. If such an argument is sound, and its soundness is seriously doubted, it should be addressed to the legislative branch of government, for the courts have no power to create the exemption or declare an immunity'".
It is apparent that the doctrine of immunity of charitable institutions for the negligent acts of their servants is firmly established in the jurisprudence of this state. Plaintiff's counsel, however, contend that the action of Sister Agatha was not that of an employee of the institution, but of its manager or superintendent. In our opinion there is no difference in principle between the action of the superintendent and that of her subordinates, so far as the liability of the hospital is concerned. The Superintendent in this case, though perhaps having the final word so far as the administration of the hospital is concerned, is herself an employee of the Society of the Daughters of St. Vincent De Paul, which owns and operates the Institution under the corporate name of "Hotel Dieu".
Furthermore, plaintiff's counsel contend that the rule of immunity is not a part of our jurisprudence, referring specifically to *Page 636 
the Jordan case, where the negligent application of a hot water bottle to the patient's foot by a nurse was the gravamen of the plaintiff's case. It is said that the reason for the decision in that case was that the nurse could not have been under the authority of the hospital at the time of the injury, being subject to the doctor's orders and, therefore, the doctrine of respondeat superior did not apply. R.C.C. Article 177. The holding in that case say counsel, "merely affirmed a familiar and well-settled rule of general tort law. The inescapable implication of this decision is that the doctrine of respondeat superior would have been applicable had the nurse's negligent act occurred at any other time or place". It is undoubtedly true that in the Jordan case the court did hold that the nurse was not under the authority of the hospital, but under that of the doctor in charge of the operation, but the opinion went further and after quoting from the case of Congdon v. Louisiana Sawmill Co.,143 La. 209, 78 So. 470, which held that "where an employer employs a physician or surgeon of ordinary skill and ability to attend to his employees, and pays the physician from a fund collected from the employees, and from which fund the employer derives no profit, he is not responsible in damages to an employee for mistakes of or malpractice by such physician; particularly, where it is not charged and proved that the employer was negligent in the selection of the physician", concluded with the statement "we perceive no difference in principle in the responsibility of a hospital in the employment of a physician and of a nurse".
We quote the following from the brief of counsel:
"If the artificial rule of immunity for hospital corporations is to be the law in this State, we can imagine no weapon keen enough to penetrate such an impregnable fictitious armor. What is to prevent a rich and powerful institution, such as the Hotel Dieu, Touro Infirmary, the Bellevue Hospital of New York City, or even the nationally famous Mayo Clinic from treating one charity patient a year and then retreating behind its shield of charity when any otherwise just claim for damages is urged against it? How can any person achieve justice against an ironclad rule which virtually denies him his day in court?
"* * *
"We here remind Your Honors of the well-known principle of general tort law, known as the good Samaritan rule, which may be stated as follows: No person is under any duty to help a fellow human being in distress, but when one undertakes to do so, one then assumes an obligation to treat the object of one's charitable impulse with all reasonable care, and will be liable for any want thereof. It can't be seriously questioned that the above is a true statement of the rule which is applicable to individuals. We submit that there is nothing so sacred about corporations as to remove them from the operation of the same rule, particularly where they advertise and hold themselves out to the public as institutions for the care and treatment of the sick and the suffering * * *".
Our answer is that it is not a question of what the jurisprudence should be, but, as pointed out, the doctrine of immunity of charitable institutions already obtains in this state. As to the possible abuse of this immunity by pretended charitable institutions, we observe that the first question to be considered is whether, as a matter of fact, the institution claiming immunity, is, in fact, charitable. In the case of impostors the rule, of course, would afford no shield. As to whether it is desirable that such immunity should exist is a question of the public policy of our state. Reference is made to the parable of the good Samaritan. Much depends upon the point of view, for example, in the case of Powers v. Massachusetts Homœopathic Hospital, 1 Cir., 109 F. 294, 303, 65 L.R.A. 372, the United States Circuit Court of Appeal, in holding that there was no difference between the pay patient and the charity patient insofar as their right to recover against a charitable institution is concerned, said: "One who accepts the benefit either of a public or of a private charity enters into a relation which exempts his benefactor from liability for the negligence of his servants in administering the charity; at any rate, if the benefactor has used due care in selecting those servants. To paraphrase the illustration put by the learned judge before whom this case was tried, it would be intolerable that a good Samaritan, who takes to his home a wounded stranger for surgical care, should be held personally liable for the negligence of his servant in caring for that stranger. Were the heart and means of that Samaritan so large that *Page 637 
he was able, not only to provide for one wounded man, but to establish a hospital for the care of a thousand, it would be no less intolerable that he should be held personally liable for the negligence of his servant in caring for any one of those thousand wounded men. We cannot perceive that the position of the defendant differs from the case supposed. The persons whose money has established this hospital are good Samaritans, perhaps giving less of personal devotion than did he, but, by combining their liberality, thus enabled to deal with suffering on a larger scale. If, in their dealings with their property appropriated to charity, they create a nuisance by themselves or by their servants, if they dig pitfalls in their grounds and the like, there are strong reasons for holding them liable to outsiders, like any other individual or corporation. The purity of their aims may not justify their torts; but, if a suffering man avails himself of their charity, he takes the risks of malpractice, if their charitable agents have been carefully selected".
We realize that there are very respectable authorities to the contrary, but we have taken our place in line with those jurisdictions which hold for the preservation of the immunity of charitable institutions. Counsel in contending for the contrary deplores the idea that there should be any difference in principle between a charitable institution and a private hospital. It must be conceded that the immunity doctrine rests upon no other authority then public policy, since it is in opposition to the general rule that employers are vicariously responsible for the negligent or wrongful acts of their employees and servants committed within the scope of their employment. It is, therefore, an exception, which some courts believe should never have been created except by legislative act.
A leading case among those which oppose the doctrine is that of Glavin v. Rhode Island Hospital, 12 R.I. 411. There it was said:
"To say that the defendant corporation is liable for negligence in the choice of its servants, is no more than saying that it is liable for any negligence that causes the injury, whether it is its direct negligence or its servants' negligence.
* * * * * *
"The argument is that hospitals, like the Rhode Island Hospital, are a public benefit; but if they are liable for the torts of the physicians or surgeons attendant on them, or of the medical or surgical internes, or of their nurses and other servants, people will be discouraged from voluntarily contributing to their foundation and support, and therefore public policy demands that they shall be exempted from liability. In our opinion the argument will not bear examination. The public is doubtless interested in the maintenance of a great public charity, such as the Rhode Island Hospital is; but it also has an interest in obliging every person and every corporation which undertakes the performance of a duty to perform it carefully, and to that extent, therefore, it has an interest against exempting any such person and any such corporation from liability for its negligences.
* * * * * *
"If the legislature is of opinion that public policy demands a limitation of this liability, it is in its power to interfere and grant an entire or a partial exemption."
It is said that the immunity extended to charitable organizations in this state discriminates between individuals and corporations. This is a mistake. There is no reason why an individual or partnership conducting a charitable enterprise should not enjoy the same exemption as charitable corporations and we know of no authority which holds otherwise.
Finally, it is said: "Should the court sustain the defendant's contention, and in effect uphold the rule, we submit that it would be tantamount to saying that when a hospital accepts a pay patient, it does so with the implied reservation that it shall be immune under the law from any liability for negligence or for deliberate wrong-doing. Is the court prepared to go so far as to say what a corporation in this State can contract against its own liability in this manner?"
Our answer to this is in the affirmative. All charitable institutions have been held to be exempt from responsibility for the wrongful acts of their employees or servants, for reasons of public policy. For the same reason such institutions are exempt from taxation. The Hotel Dieu, for example, owns property in the City of New Orleans which, according to the record, is valued at more than one million dollars and yet it pays no city or state *Page 638 
taxes. Sec. 4 of Art. X of the Constitution of Louisiana of 1921.
The dispensing of charity in a community may be said to be of the utmost importance in the promotion of the public welfare, one of the primary purposes for which all governments are organized and to the extent that such institutions administer to the indigent sick, they are discharging governmental functions and, therefore, can be said to merit especial consideration.
Our conclusion is that the exception of no cause of action should have been sustained below, consequently, and for the reasons assigned the judgment appealed from is annulled, avoided and reversed and it is now ordered that there be judgment in favor of the defendant, Hotel Dieu, sustaining the exception of no cause of action and dismissing the suit of plaintiff.
Reversed.