**HEIRS OF Ude C. FRUGE**

v.

**BLOOD SERVICES.**

**Civ. A. No. 17297.**

United States District Court,
W. D. Louisiana,
Opelousas Division.

Oct. 25, 1973.

J. Michael Morrow, DeVillier & Ardoin, Eunice, La., for plaintiffs.

Richard C. Meaux, Davidson, Meaux, Onebane & Donohoe, Lafayette, La., for defendant.

**NAUMAN S. SCOTT, District Judge:**

We have diversity jurisdiction of this action seeking to recover damages from Blood Services, a Corporation (hereinafter referred to as "Blood Services"), for the death of plaintiffs' mother, Mrs. Ude C. Fruge. Plaintiffs contend that their mother died as a result of transfusions of blood obtained through Blood Services. Their claims are based on the theory of breach of warranty and upon negligence.

Blood Services has filed a Motion for Summary Judgment predicated upon the following grounds:

1) Blood Services is a charitable organization and therefore is immune from liability for negligence;

2) There can be no recovery in Louisiana under a theory of breach of warranty in a blood transfusion situation;

3) Plaintiffs may not recover on any theory of strict liability in tort; and

4) The Louisiana Wrongful Death article LSA–C.C. 2315 will not support an action based on a theory of breach of implied warranty.

Likewise, Blood Services' insurer, Aetna Casualty & Surety Company (hereinafter referred to as "Aetna") has filed a Motion for Summary Judgment based upon the above grounds numbered 2, 3 and 4.

We shall discuss the various grounds for the motion in the sequence above set forth.

## CHARITABLE IMMUNITY

The evidence presented in support of the Motion for Summary Judgment clearly discloses the charitable nature of Blood Services. This evidence, when considered with the Louisiana jurisprudence, unequivocally reveals that it is a charitable institution and consequently immune from suit.

The two affidavits of W. Quinn Jordan, President of Blood Services, identified as Exhibits C and D, as well as Exhibits E, F, G, H, I, J and K, reveal that Blood Services is a charitable, non-profit corporation which provides blood and blood products for sick people, but only through the prescription of their doctors. Although a fee is charged for most units of blood, the funds generated are used to offset the cost of maintaining for the community a constant, dependable supply of blood and to cover the costs of screening, processing and distributing blood and blood products when and where needed. Surplus revenues from its operation are used by Blood Services for education and research, for improvement of scientific and medical techniques for related charitable activities and for the expansion of the geographical areas which Blood Services serves. It is not engaged in any advertising programs designed to stimulate or create a demand for its products, nor does it employ any salesmen or detail men. The Federal Government has recognized for some time the fact that Blood Services is a charitable institution by granting and maintaining Blood Services tax-exempt status.

The test that has been adopted by the courts in Louisiana for determining whether an institution is charitable was first enunciated in Jordan v. Touro Infirmary, 123 So. 726 (La.App.Orl.Cir. 1922) as follows:

"The test which determines whether such an enterprise is charitable, or

otherwise is its purpose. If its purpose is to make profit, it is not a charitable enterprise. If it is to heal the sick and relieve the suffering, without hope or purpose of getting gain from its operation, it is charitable." 123 So. 731.

As the above cited affidavits reveal, Blood Services is clearly a benevolent organization. No one makes any profit from the operation of the blood bank. No dividends are paid as there are no stockholders. The primary purpose of the organization is to serve all people, rich or poor. We find that Blood Services adequately and amply meets the test established by the *Jordan* decision. See also the cases of Thibodaux v. Sisters of Charity of the Incarnate Word, 11 La. App. 423, 123 So. 466 (La.App.2d Cir. 1929); Jurjevich v. Hotel Dieu, 11 So. 2d 632 (La.App.Orl.Cir.1943); D'Antoni v. Sara Mayo Hospital, 144 So.2d 643 (La.App. 4th Cir. 1962); Grant v. Touro Infirmary, 254 La. 204, 223 So.2d 148 (1969); Barrios v. Sara Mayo Hospital, 224 So.2d 846 (La.App. 4th Cir. 1969).

■ The affidavit of John D. Alsever, M.D. (Exhibit A) discloses that Blood Services never has a contact with the patient himself. It deals only with the hospital facilities it serves and/or the doctor who prescribes the transfusion. As a result of these facts, plaintiff contends that the doctrine of charitable immunity does not apply in this case because there was no contractual relationship existing between Blood Services and the deceased. We are unable to agree with this contention.

■ The Louisiana courts have never required that a contract be entered into between the charity and the plaintiff, but only that the plaintiff be a beneficiary of the charity. This was recognized by the Louisiana Supreme Court in Grant v. Touro Infirmary, *supra*. The *Grant* decision quotes with approval from American Jurisprudence which indicates that beneficiaries include inmates, patients or others benefiting, or

seeking to benefit from the charitable activities of the charity. 15 Am.Jur.2d, Charities, § 163 (1964).

■ The word "beneficiaries" has been interpreted by Louisiana courts to mean persons who are recipients of the benefits of the charity. Lusk v. United States Fidelity and Guaranty Company, 199 So. 666 (La.App.Orl.Cir.1941). In fact, both paying and nonpaying recipients of services from charitable organizations have been denied recovery against the charity. Jordan v. Touro Infirmary, *supra*; Unser v. Baptist Rescue Mission, 157 So. 298 (La.App.Orl. Cir.1934); Messina v. Societe Francaise de Bienfaissance, 170 So. 801 (La. App.Orl.Cir.1936); 15 Am.Jur.2d, Charities, § 166 (1964).

We find that Mrs. Fruge was a recipient of the benefits rendered by Blood Services, and that it is a charitable institution immune from an action in tort under LSA–C.C. 2315. Blood Services' motion is granted and the other grounds supporting the motions for summary judgment will be considered only insofar as they apply to the liability insurer, Aetna.

### BREACH OF WARRANTY

The package label on each unit of blood supplied by Blood Services contains the following disclaimer of warranty and warning:

"CAUTIONS: Cross match before using. Compare blood group on label with recipient's blood group before administration. Mix thoroughly before using. A filter must be used in administration set. Administer intravenously without warming. Do not add other medication to the bag prior to administration. Do not administer conjointly with dextrose-in-water solution. The blood bank will not assume responsibility for more than one transfusion from this bag. Container is not returnable; discard after use. Average adult dose 500 ml. Federal law prohibits dispensing without pre-

scription. See circular for instructions for use.

WARNING: Whole blood may transmit certain diseases, such as viral hepatitis, for the presence of which no laboratory tests are available. Because of this fact, human blood is delivered without any warranty, whether for merchantability, fitness or otherwise, extending beyond the description on this label."

The Official Package Circular for Blood Services' blood provides the following warning:

"HOMOLOGOUS SERUM JAUNDICE (VIRAL HEPATITIS): The transmission of viral hepatitis is an inherent and unavoidable risk which is present each time a unit of whole blood is given. There is no known laboratory tests which will detect the presence of the virus in the donor blood. The incubation period is usually 15 to 180 days and the disease is sometimes severe and protracted and may be fatal."

■■ In light of the above warnings and disclaimer there can be no liability for breach of an "express warranty". California Chemical Co. v. Lovett, 204 So.2d 633 (La.App. 3rd Cir. 1967). Furthermore, no "implied warranties" attach to the handling, processing, distributing or transfusion of blood or blood products in this state. The Louisiana legislature in 1968 expressed its desire to confirm the "no-warranty" rule in the State of Louisiana, and to insure that under the Louisiana Civil Code, no "new" implied warranty theory could be raised in the blood transfusion setting, when it adopted the following limitations on implied warranties:

"Notwithstanding the provisions of Section A.2 of this article, the implied warranties of merchantability and fitness shall not be applicable to the furnishing of human blood, blood plasma, or other human tissue or organs from a blood bank or reservoir of such other tissues or organs. Such blood, blood plasma, or tissue or organs shall not for the purposes of this Article be considered commodity subject to sale or barter, but shall be considered as medical services." La. Civil Code, Art. 1764, Section B (LSA–C.C. 1764B) as amended by Act 301 of 1968.

■ Claimants assert that LSA–C.C. 1764B is unconstitutional, in that it is an *ultra vires* act of the legislature which violates substantive due process. We find determinative of this issue the case of McDaniel v. Baptist Memorial Hospital, 469 F.2d 230 (6th Cir. 1972), in which the Tennessee statute, almost identical to Article 1764B, was challenged on similar grounds. In upholding the constitutionality of the Tennessee statute, the court stated:

"In sustaining the constitutionality of the Tennessee statute, the District Judge said:

'The burden is, of course, upon the plaintiff here who challenges the Tennessee Statute because it assertedly offends due process and equal protection provisions. The fact that the important service of blood transfusions has been singled out for legislative treatment, and immunity to some degree is bestowed, does not, in and of itself, make it unlawful or unconstitutional. Estrin v. Moss, 221 Tenn. 657, 430 S.W.2d 345 (Tenn.1968). The question is whether the classification is so arbitrary and capricious as to constitute denial of equal protection. City of Chattanooga v. Harris, 223 Tenn. 51, 442 S.W.2d 602 (Tenn. 1969). Legislative acts are entitled to great weight and courts "favor the constitutionality of statutes". 16 C. J.S. Const.Law. § 98a. See Dykes v. Hamilton County, 183 Tenn. 71, 191 S.W.2d 155 (1945); Holly v. Elizabethton, 193 Tenn. 46, 241 S.W.2d 1001 (1951); Smithson v. State of Tennessee, 222 Tenn. 499, 438 S.W.2d 61 (1969); See also Donahoo v. Mason & Dixon Lines, 199 Tenn. 145, 285 S.W.2d 125 (1955).

'The law in question involves all within the class of selling or distributing blood or plasma equally and treats this activity as a medical service. There appears to be no discrimination in the law favoring the hospital per se, because it is a hospital rendering important services. We will, therefore, recognize the provisions of T.C.A. 47–2–316 in question as being a constitutional exercise of authority for the public welfare by the Tennessee legislature.'

We have been cited no case, state or federal, whereby a statute such as the one in question has been declared unconstitutional. The fact that some forty-one states have adopted similar legislation lends weight to the presumption of constitutionality." 469 F.2d 235.

Thus we find LSA–C.C. 1764B to be a valid constitutional exercise of authority by the Louisiana legislature for the public welfare of this state and its residents.

In view of the above facts, we hold that there is simply no legal basis upon which the plaintiffs may recover in this case for the breach of any type of warranty.

## STRICT LIABILITY IN TORT

Plaintiffs urge that the doctrine of strict liability in tort applies in Louisiana,[1] and is not affected by the amendment in 1968 adding Section B, supra, to LSA–C.C. 1764, because that article appears under that title of the code covering conventional obligations and is so limited by the specific language in the article.

Blood, whether in the veins or arteries of a human being or in a container awaiting transfusion, is living human tissue, as is a kidney, a cornea or a heart. A blood transfusion is a common standard medical procedure and great quantities of whole blood are necessary in the daily operation of hundreds of clinics, infirmaries, hospitals and other medical installations. The satisfaction of this demand is imperative, and, since it is medically impossible to provide whole blood of absolute and proven immunity to certain diseases such as viral hepatitis, this need must be satisfied from whole blood despite the inherent risk of infection.[2]

---

1. Judge Putnam in Soileau v. Nicklos Drilling Co. (W.D.La.1969), 320 F.Supp. 119, indicates that this broad coverage of "strict liability" obtains in Louisiana and Judge Wisdom in Welch v. Outboard Marine Corp., 481 F.2d 252 (5th Cir. 1973), indicates that the Louisiana Supreme Court case of Weber v. Fidelity & Casualty Insurance Co., (1971), 259 La. 599, 250 So.2d 754, establishes such doctrine in Louisiana. Although Justice Tate does indicate this result in his definition he never refers to the doctrine of strict liability and specifies defenses on which the defendant might have prevailed had he made them. These defenses are incompatible with the doctrine of strict liability.

2. See Restatement, Second, Torts § 402A, Comment k. "k. *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because

■ Each container unit of blood provided by Blood Services bears a label, supra, and an Official Package Circular, supra, which are directed primarily to the patient's prescribing physician. 21 U.S.C. § 353 provides that blood and blood products may be dispensed only upon the prescription of a licensed practitioner. In this sense they are analogous to "prescription only" drugs. Only the physician is in a position to weigh the needs of his patient against the risk involved, and only he can prescribe the transfusion. Thus, in this situation, the warning to the patient's physician is all that is required, Davis v. Wyeth Laboratories, 399 F.2d 121, 130 (9th Cir. 1968):

> "Ordinarily in the case of prescription drug, warnings to the prescribing physician is sufficient. In such cases the choice involved is essentially a medical one involving an assessment of medical risks in the light of the physician's knowledge of his patient's needs and susceptibility.
>
> Further, it is difficult under such circumstances for the manufacturer, by label or direct communication to reach the consumer with a warning. A warning to the medical profession is in such cases the only effective means by which a warning could help the patient."

See also Love v. Wolf, 226 Cal.App.2d 378, 38 Cal.Rptr. 183 (1964); Sterling Drug v. Cornish, 370 F.2d 82 (8th Cir. 1967); Basko v. Sterling Drug Co. et al.. 416 F.2d 417 (2d Cir. 1969); Mulder v.

Parke Davis & Co., 288 Minn. 332, 181 N.W.2d 882 (1970).

The need for whole blood is such that it must be utilized despite the known danger of disease. Virtually all of the states have recognized this necessity of having available a dependable supply of blood in quantity for the community at a cost the community can bear, and have sought to protect these producers as a matter of public policy. The Illinois statute, for instance, provides as follows:

> "The availability of scientific knowledge, skills and materials for the purpose of injecting, transfusing or transplanting human whole blood, plasma, blood products, blood derivatives and products, corneas, bones, or organs or other human tissue is important to the health and welfare of the people of this State. The imposition of legal liability without fault upon the persons and organizations engaged in such scientific procedures inhibits the exercise of sound medical judgment and restricts the availability of important scientific knowledge, skills and materials. It is therefore the public policy of this State to promote the health, and welfare of the people by limiting the legal liability arising out of such scientific procedures to instances of negligence or willful misconduct." Illinois Statutes, Title 91, Section 181 (1971).

In addition to Louisiana, 43 other states have adopted statutes which, in effect, preclude the imposition of legal liability without fault to blood transfusion cases.[3]

---

he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." (Emphasis in original).

3. *Alabama*, Code of Ala., Tit. 7A, § 2–314(4); *Alaska*, AS 45.05.100(e); *Arizona*, A.R.S. § 36–1151; *Arkansas*, Ark.Stat.Ann. §§ 85–2–316(3)(d) (Add.1961), 82–1607 to 82–1608 (Repl.1960); *California*, West's Ann.Health & Safety Code § 1606; *Colorado*, 1971 Perm.Supp., C.R.S., 41–2–11(2); *Connecticut*, C.G.S.A. § 19–139*l*; *Delaware*,

5A Del.C. § 2–316(5); *Florida*, F.S.A. § 672.2–316(5); *Georgia*, Code, §§ 105–1105, 109A–2–316(5); *Hawaii*, HRS § 325–91; *Idaho*, I.C. § 39–3702; *Illinois*, S.H.A. ch. 91, §§ 181–184; *Indiana*, Ind.Ann.Stat. §§ 35–4810 to 35–4811 (Burns' 1972 Supp.), IC 1971, 16–8–7–1 to 16–8–7–2; *Kansas*, K.S.A. 65–3701; *Kentucky*, KRS 139.125; *Maine*, 11 M.R.S.A. § 2–108; *Maryland*, Code 1957, art. 43, § 136B; *Massachusetts*, M.G.L.A., c. 106 § 2–316(5); *Michigan*, M.S.A. § 14.-528(1), M.C.L.A. § 691.1511; *Minnesota*, M. S.A. § 525.928; *Missouri*, § 431.069, RSMo

■ The doctrine of strict liability has been applied traditionally in Louisiana under the concept of implied warranty. It is not unusual therefore that the prohibition declared in 1968 in LSA–C.C. 1764B appears in an article relating to warranty. But obviously the purpose of the 1968 amendment was not to redefine or limit "implied warranty" as a legal concept, but rather to protect the producers of whole blood and similar products necessary to the protection of health and to the operation of medical and health facilities. It was a declaration of public policy by the legislature of the State of Louisiana.[4] There is no tort liability.

## CONCLUSION

We find that there can be no recovery based on a theory of a breach of "implied warranty" and that the public policy of Louisiana forbids recovery for injuries resulting from the use of whole blood. It will be unnecessary therefore to decide whether LSA–C.C. Article 2315 will support an action based on this theory.

Accordingly, summary judgment is granted in favor of Blood Services dismissing all the plaintiff's demands. Likewise, all claims against Aetna other than in negligence are dismissed.

Defendants should submit a judgment for execution in accordance with Local Rule 9(e) of this Court.

1969, V.A.M.S.; *Mississippi,* Code 1972, § 41–41–1; *Montana,* R.C.M.1947, §§ 69–2203 to 69–2205; *Nebraska,* R.S.Supp.1967, § 71–4001; *Nevada,* N.R.S. 460.010; *New Mexico,* § 12–12–5, N.M.S.A.1953 (Repl.Vol. 3); *North Carolina,* G.S. § 90–220.10; *North Dakota,* NDCC 41–02–33, subd. 3(d), 43–17–40; *Ohio,* R.C. § 2108.11; *Oklahoma,* 63 O.S.1971, § 2151; *Oregon,* ORS 97–300; *Pennsylvania,* 35 P.S. § 10021; *South Carolina,* Code 1962, § 32–559; *South Dakota,* SDCL 57–4–33.1; *Tennessee,* T.C.A. 47–2–316(5); *Texas,* Vernon's Ann.Civ.St. art. 4590–3, subd. 2; *Utah,* U.C.A.1953, 26–29–1;

*Virginia,* Code 1950, § 32–364.2; *Washington,* RCWA 70.54.120; *West Virginia,* Code, 16–23–1; *Wisconsin,* W.S.A. 146.31(2); *Wyoming,* W.S.1957, § 35–221.10.

4. This policy of the State of Louisiana is not abrogated or revoked by the subsequent opinion of Weber v. Fidelity & Casualty Insurance Co., *supra. Weber* made no specific reference to LSA–C.C. 1764B, the validity of that statute was not in question and certainly we cannot impute that the declared public policy of the State of Louisiana was repudiated by that case.