**HEIRS OF Ude C. FRUGE et al.,
Plaintiffs-Appellants,**

v.

**BLOOD SERVICES and Aetna
Casualty & Surety Company,
Defendants-Appellees.**

No. 74–1615.

United States Court of Appeals,
Fifth Circuit.

Jan. 17, 1975.

J. Michael Morrow, J. Winston Ardoin, Eunice, La., Gary Boland, Baton Rouge, La., for plaintiffs-appellants.

Richard C. Meaux, Lafayette, La., for Blood Services and others.

Douglas L. Irish, Phoenix, Ariz., for defendants-appellees.

Before TUTTLE, RONEY and GEE, Circuit Judges.

TUTTLE, Circuit Judge:

The question presented by this appeal is whether the plaintiffs-appellants, the children and sole heirs of Mrs. Ude C. Fruge, have a cause of action under Louisiana law against the supplier of blood used in a transfusion that allegedly caused their mother's death.

Mrs. Fruge, a 75-year-old widow, entered Moosa Memorial Hospital in Eunice, Louisiana, in March of 1970. On July 25, 1970, she was supplied with whole blood by the defendant-appellee for a transfusion in the course of treat-

ment for hypoproteinemia and anemia. Some time later, Mrs. Fruge developed homologous serum jaundice, more commonly known as viral hepatitis, and required further hospitalization. She died on January 8, 1971.

Her heirs brought this wrongful death action against Blood Services, an Arizona non-profit corporation, in the United States District Court for the Western District of Louisiana. Aetna Casualty and Surety Company, the insurer of Blood Services, was joined as a defendant. The plaintiffs based their claim on four grounds: negligence, breach of warranty, breach of implied warranty and strict liability.

After substantial discovery by both sides, Blood Services moved for summary judgment, pursuant to Rule 56(b) Fed.R. Civ.P., on four issues:

"(1) Blood Services is a charitable organization and is, therefore, immune from liability and suit.

"(2) No recovery may be had on a theory of breach of warranty in a blood transfusion situation.

"(3) Plaintiffs may not recover on any strict liability theory.

"(4) No recovery may be had for death on a theory of breach of implied warranty."

Several months later, Aetna also moved for summary judgment on grounds (2), (3) and (4) of the motion filed by Blood Services.[1]

The trial court held under Louisiana law that Blood Services was a charity and thus immune from suit in tort, that Article 1764, subd. B of the Louisiana Civil Code barred liability of the defendants under the theories of both breach of "any type" of warranty and strict liability in tort, and that it was unnecessary to decide whether Article 2315 of the Code would support a cause of action for · breach of implied warranty in tort. 365 F.Supp. 1344 (W.D.La.1973). In conclu-

sion, the trial court said: "Accordingly, summary judgment is granted in favor of Blood Services dismissing all the plaintiff's demands. Likewise, all claims against Aetna other than in negligence are dismissed." 365 F.Supp. at 1351.

The plaintiffs on appeal contend that the trial court was wrong in law on each issue: that the doctrine of charitable immunity has been abandoned by the Louisiana courts, that Article 1764, subd. B of the Louisiana Civil Code does not bar causes of action under theories of breach of warranty and strict liability, that if it does it violates the state constitution, and that Article 2315 of the Code supports an action based on breach of implied warranty.

We agree with the plaintiffs that the doctrine of charitable immunity is no longer law in Louisiana; indeed, the defendants conceded this during oral argument before us. Thus, the case must be remanded for further proceedings on the issue of negligence. We agree with the trial court's disposition of all other issues in the case, although we decide against the plaintiffs the one issue—the availability of a cause of action for breach of implied warranty under Article 2315— held open by the trial court.

Therefore, we affirm in part, reverse in part, and remand.

## I. DOCTRINE OF CHARITABLE IMMUNITY

The trial court properly held at the time it granted summary judgment that Blood Services was a charity under Louisiana law, and thus that it was immune from suit in tort, citing Grant v. Touro Infirmary, 254 La. 204, 223 So.2d 148 (1969). After the trial court's judgment, the Supreme Court of Louisiana overruled *Grant* in Garlington v. Kingsley, 289 So.2d 88 (La.1974) and held therein that charitable institutions were not immune from suit in tort. The Louisiana

---

1. Aetna did not move for summary judgment on the first issue, because under then well-settled Louisiana law, a charitable institution's immunity from suit in tort was personal and did not extend to its insurer. *See, e. g.,* Grant v. Touro Infirmary, 254 La. 204, 223 So.2d 148, 151 (1969).

Supreme Court subsequently held that Garlington v. Kingsley is effective retroactively. Jackson v. Doe, 296 So.2d 323 (La.1974); Connor v. Methodist Hospital, 297 So.2d 660 (La.1974).

■ During oral argument before this Court, the defendants admitted that the doctrine of charitable immunity no longer protected them from suit in negligence. However, they urged that there is an independent ground for affirming the result below as there is no evidence in the record of any negligence by defendant Blood Services. This argument is without merit, and none of the cases cited by the defendants in support of the argument are on point.[2]

■ There indeed is no evidence in the record of any negligence by Blood Services, because there was no need for the plaintiffs to present any in the posture in which the motion for summary judgment arose. The motion by Blood Services for summary judgment on issue (1) was *solely* on the question of charitable immunity and not on *negligence vel non*. As such, the plaintiffs were never called upon to produce any Rule 56(c) materials—such as depositions, answers to interrogatories and affidavits—that would show that the defendants were negligent in fact. We cannot now say that there is no genuine material issue of fact with respect to negligence by the defendants, because the question was never raised in the trial court. Where summary judgment is granted on one issue, an appellate court may not extend that judgment

to another issue under the guise of affirming the "result below" when the effect is to preclude the losing party from "disput[ing] facts material to that claim." Fountain v. Filson, 336 U.S. 681, 683, 69 S.Ct. 754, 756, 93 L.Ed. 971 (1949).

■ In sum, now that it is clear that the defendants are not immune from suit in tort, the case must be remanded for further proceedings on the issue of negligence.

The only question now is whether the plaintiffs-appellants have any cause of action other than negligence.

We conclude that they do not.

## II. OTHER CAUSES OF ACTION

■ This is one of those extremely rare situations where the precise legal question before a court has been clearly foreseen by the legislature and unequivocally resolved. Six years ago, the Louisiana legislature—like many others[3]—amended its laws to extinguish all causes of action except negligence against blood banks and hospitals supplying whole blood and its components. The reason for this unusual action was simple, and apparently cogent to the legislature: the obvious and overwhelming need for blood and blood products to be used in transfusions and in surgery was barely met by available supplies, and suppliers were threatened by crippling legal liability for a very small but—according to the majority of medical authorities—hard to avoid risk[4] that their

---

2. The cases cited by the defendants stand, quite correctly, for the unexceptionable proposition that an appellate court may affirm the decision—if correct—of a trial court even though the trial court relied on the wrong reason in reaching its result. *See, e. g.,* Helvering Gowran, 302 U.S. 238, 245 [58 S.Ct. 154, 82 L.Ed. 224] (1947), and cases therein cited. The underlying assumption of this proposition is, of course, that the parties had a full and fair opportunity to develop facts relevant to the decision. Where this opportunity has not been available, the proper resolution of the appeal is not affirmance but remand.

3. A total of 44 states have adopted similar statutes to preclude the imposition of strict liability in blood transfusion cases. The statutes are cited by the trial court in its reported opinion, 365 F.Supp. at 1350, n. 3.

4. The question of the detectability of viral hepatitis in donor blood has been hotly disputed, and we, of course, express no opinion whatsoever as to the answer. *See, generally,* A. W. Holmes, J. B. Alsever, D. A. Garibaldi, "Medical Judgment vs. Legal Doctrine in the Matter of Hepatitis Contaminated Blood," 48 Chi.B.Rec. 204 (June 1967), 48 Chi.B.Rec. 22 (Oct. 1967); Boggs Melnick, Conrad & Feleher, "Viral Hepatitis," 214 J.A.M.A. 1041 (1970).

blood carried undetectable viral hepatitis. If competent and carefully operated blood banks were to survive, the state legislature believed, they required legislative protection.[5]

The form of protection developed by the State of Louisiana was an amendment to the Civil Code provision that defined the subjects of contract and created means for limiting or renouncing implied warranties in contracts of sale. Article 1764 of the Civil Code, as amended by Acts of 1968, No. 301, § 1, provides in full:

Art. 1764. *Contracts; subject, motive, elements determining nature, and exceptions to implied warranty provisions.*

A. All things that are not forbidden by law, may legally become the subject of, or the motive for contracts; but different agreements are governed by different rules, adapted to the nature of each contract, to distinguish which it is necessary in every contract to consider:

1. That which is the essence of the contract, for the want whereof there is either no contract at all, or a contract of another description. Thus a price is essential to the contract of sale; if there be none, it is either no contract, or if the consideration be other property, it is an exchange.

2. Things which, although not essential to the contract, yet are implied from the nature of such agreement, if no stipulation be made respecting them, but which the parties may expressly modify or renounce, without destroying the contract or changing its description; of this nature is warranty, which is implied in every sale, but which may be modified or renounced, without changing the character of the contract or destroying its effect.

3. Accidental stipulations, which belong neither to the essence nor the nature of the contract but depend solely on the will of the parties. The term given for the payment of a loan, the place at which it is to be paid, and the nature of the rent payable on a lease, are examples of accidental stipulations. What belongs to the essence and to the nature of each particular description of contract, is determined by the law defining such contracts; accidental stipulations depend on the will of the parties, regulated by the general rules applying to all contracts.

B. Notwithstanding the provisions of Section A.2, of this Article, the implied warranties of merchantability and fitness shall not be applicable to a contract for the sale of human blood, blood plasma or other human tissue or organs from a blood bank or reservoir of such other tissues or organs. Such blood, blood plasma or tissue or organs shall not for the purposes of this Article be considered commodities subject to sale or barter but shall be considered as medical services.

A. *Breach of Implied Warranty.*

The immediate effect of the amendment, which is section B of the article, is obvious: all implied warranties resulting from the sale of blood and like materials were thereby revoked. Thus, the cause of action for breach of implied warranty in the distribution of blood was legislatively extinguished.

5. The Illinois legislature, for example, in enacting a similar statute (S.H.A. ch. 91, §§ 181–184), expressed its policy in these words:

"The availability of scientific knowledge, skills and materials for the purpose of injecting, transfusing or transplanting human whole blood, plasma, blood products, blood derivatives and products, corneas, bones, or organs or other human tissue is important to the health and welfare of the people of this State. The imposition of legal liability without fault upon the persons and organizations engaged in such scientific procedures inhibits the exercise of sound medical judgment and restricts the availability of important scientific knowledge, skills and materials. It is therefore the public policy of this State to promote the health and welfare of the people by limiting the legal liability arising out of such scientific procedures to instances of negligence or willful misconduct." Illinois Statutes, Title 91, Section 181 (1971).

### B. *Breach of Warranty.*

■■ The other effects of the amendment are equally clear but are not at once apparent until the amended article is viewed in the context of other codal provisions. The linchpin of the amendment is its designation of blood sales as "medical services." Plaintiffs-appellants argue that this designation is confined to causes of action based on implied warranties by the phrase "for the purposes of this Article." However, this misstates the *general purpose* of the article. Article 1764 is the third article of Title IV of the Civil Code, "Of Conventional Obligations." In this context and by its language, the article serves to define the scope of consensual obligations in Louisiana's civil law. To read the article as simply a codification of the law of implied warranty is to ignore the bulk of the article's text. The article, taken as a whole, defines and limits the scope of sales; that is, it establishes in general terms the "subjects" of contracts in Louisiana. With this broad scope, any definition excluding any type of transaction from the realm of consensual obligation makes that transaction other than a sale.

This effect is critical to the implementation of the legislature's policy to protect blood suppliers and hospitals, because, as a result, without the *sale* of a marketed *product,* there can be no actions for breach of warranty for injuries or death resulting from blood transfusions. It is axiomatic, of course, that breach of express warranty is not available as a cause of action without a sale, because the essence of warranty is a consensual agreement—express or implied—

arising from contract. LSA–C.C. art. 1964, art. 2475. Lartique v. R. J. Reynolds Tobacco Co., 317 F.2d 19, 27 (5th Cir. 1963). Without a sale under contract, there is no consensual nexus between the parties and thus no warranties may attach.

The sale/service distinction has been criticized in these cases as a disingenuous foundation upon which to erect a major policy, *see, e. g.,* Russell v. Community Blood Bank, Inc., 185 So.2d 749, 752 (Fla. App.1966), but the distinction is long-established, Lartique v. R. J. Reynolds Tobacco Co., *supra,* 317 F.2d at 31, note 23, and such criticisms do not detract from its validity. *See,* part III of this opinion, *infra.*

### C. *Strict Liability.*

■ The designation of the provision of blood as a service has another effect under Louisiana law. Under the rapidly developing Louisiana law of products liability,[6] strict liability is unavailable as a cause of action without the sale of a marketed product. Thus the statute effectively bars a claim based on strict liability.

■ It has only been recognized recently that the civil law of Louisiana includes a doctrine of strict liability at all.[7] The threshold prerequisite to the availability of the cause of action is the sale in fact of a marketed product. Weber v. Fidelity & Casualty Ins. Co., 250 So.2d 754, 755 (La.1971); Welch v. Outboard Marine Corp., 5 Cir., 481 F.2d 252, 254; *see, generally,* Wade, Strict Tort Liability of Manufacturers, 19 Sw. L.J. 5, 13 (1965); *cf.,* McDaniel v. Baptist

---

**6.** Liability for defective products under the Louisiana Civil Code was exhaustively examined in Lartique v. R. J. Reynolds Tobacco Co., 317 F.2d 19 (5th Cir. 1963). *See, further,* Soileau v. Nichola[o]s Drilling Co., 302 F.Supp. 119 (W.D.La.1969); Welch v. Outboard Marine Corp., 481 F.2d 252 (5th Cir. 1973). *See, also,* Weber v. Fidelity & Casualty Ins. Co., [259 La. 599] 250 So.2d 754 (La. 1971).

**7.** The Louisiana doctrine was firmly established in Weber v. Fidelity & Casualty Ins. Co., *supra,* note 6. Although the majority

opinion does not mention the term "strict liability" in so many words, the case has consistently been viewed as settling the principles of liability without fault in Louisiana law. *See,* Weber v. Fidelity & Casualty Ins. Co., *id.,* [250 So.2d] at 758ff, (dissenting opinion) Welch v. Outboard Marine Corp., *supra,* note 6, [481 F.2d] at 255–56 [256]. For earlier developments in Louisiana, *see* Soileau v. Nicholas Drilling Co., *supra,* note 6. *See, also,* Lartique v. R. J. Reynolds Tobacco Co., *supra,* note 6; Penn v. Inferno Manufacturing Corp., 199 So.2d 210 (La.App.1967), cert. denied [251 La. 27] 202 So.2d 649 (1967).

Memorial Hospital, 469 F.2d 230, 233 (6th Cir. 1972); Restatement of Torts, Second, § 402A(1); *see, also,* Reyes v. Wyeth Laboratories, 498 F.2d 1264 (5th Cir. 1974). The point of the prerequisite is that the theoretical underpinnings of strict liability as recognized in Louisiana are irrelevant to, and inconsistent with, situations where the plaintiff is harmed by the latent defect of an article that has not reached him or her through the marketplace; the essence of Louisiana's strict liability against manufacturers or sellers of products with latent defects is that the purchaser or consumer relied on the representations of the manufacturer or seller that the product was safe for its intended use, and that the danger inherent in the product was within the manufacturer's or seller's power to prevent. *Weber, supra.* Neither of these classical factors applies to the provision of blood by blood banks or hospitals for two reasons: 1) the material, in relatively small percentages, is said to be unavoidably dangerous (*see,* Restatement of Torts, Second, § 402A, comment k, *but see* note 4, *supra*), and 2) the consumer does not rely on the supplier's represen-

tations, but instead relies on the skill and competence of the attending physician to judge whether the known risk [8] is outweighed by the necessity for the material.

We express no opinion as to the wisdom of this doctrine, or its limitations; our only function is to determine applicable Louisiana law. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In our view the district court correctly held that the plaintiff's claim under a theory of strict liability was barred under Louisiana law.

■ It is not magical that the codal provisions eliminated all causes of action except negligence for supplying defective blood and blood components. This was the very purpose of the provisions. *See,* Recent Developments, 69 Mich.L. Rev. 1172, 1179–80 (1969). It must not be forgotten that the effect of the codal provisions is two-fold: they bar all causes of action arising from the supply of blood itself, but they preserve the classical delictual action based on fault embodied in Article 2315 of the Code.[9] The

---

8. Each unit of blood supplied by defendant Blood Services carried this notice:

"Federal law prohibits dispensing without prescription. See circular for instructions for use.

"WARNING: Whole blood may transmit certain diseases, such as viral hepatitis, for the presence of which no laboratory tests are available. Because of this fact, human blood is delivered without any warranty, whether of merchantability, fitness or otherwise, extending beyond the description on this label."

In addition, defendant Blood Services distributed the following Official Package Circular to each hospital it supplied:

"HOMOLOGOUS SERUM JAUNDICE (VIRAL HEPATITIS): The transmission of viral hepatitis is an inherent and unavoidable risk which is present each time a unit of whole blood is given. There is no known laboratory test which will detect the presence of the virus in the donor blood. The incubation period is usually 15 to 180 days and the disease is often severe and protracted and may be fatal."

9. LSA–C.C. article 2315 provides in full:

"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.

The right to recover damages to property caused by an offense or quasi offense is a property right which, on the death of the obligee, is inherited by his legal, instituted, or irregular heirs, subject to the community rights of the surviving spouse.

The right to recover all other damages caused by an offense or quasi offense, if the injured person dies, shall survive for a period of one year from the death of the deceased in favor of: (1) the surviving spouse and child or children of the deceased, or either such spouse or such child or children; (2) the surviving father and mother of the deceased, or either of them, if he left no spouse or child surviving; and (3) the surviving brothers and sisters of the deceased, or any of them, if he left no spouse, child, or parent surviving. The survivors in whose favor this right of action survives may also recover the damages which they sustained through the wrongful death of the deceased. A right to recover damages under the provisions of this para-

legislature did not intend to create absolute immunity for those whose material or service caused injury or death resulting from blood transfusions. The compelling reasons for abolishing warranties and strict liability in this area evaporate when the reason for the harm is not the hard to avoid danger inherent in the blood or its use, but is the result of negligence. Actionable negligence here may take many forms, of which some, but not all, might include careless screening of blood donors, negligent handling of blood materials or improvident decisions to order transfusions in light of high risks that outweigh meager benefits. In these circumstances, there is no doubt that liability would still attach under Article 2315; the plenary protection created by Article 1764, as amended, would no longer be applicable or justified. In sum, it is only in cases of negligence that a cause of action is available under the Code in such circumstances.

## III. CONSTITUTIONALITY OF ART. 1764

The plaintiffs-appellants challenge not only the construction of Article 1764, but also its state constitutionality. They contend that Article 1764 violates the guarantee of due process, provided for by Article 1, § 2[10] of the Louisiana Constitution, and the prohibition against the legislative creation of an exclusive right or immunity to an individual in Article 4, § 4.[11] The argument, in essence, is two-fold: that 1) the legislature may not, acting consistently with limitations imposed by the state constitution, eliminate causes of action already provided by the positive law announced in the Code, 2) for the benefit of a specific individual or organization.

We are unable to accept this reasoning. For over 50 years, the Louisiana courts have recognized the validity of legislative regulation of causes of action, including replacement and even extinction, that one person may have against another for personal injuries. Colorado v. Johnson Iron Works, 146 La. 68, 83 So. 381 (1919). The entire scheme of workmen's compensation is grounded on the acknowledgment of this power. Id. Other state courts have repeated this acknowledgment over the years in other areas. See, e.g., Paul v. Nolen, 166 So. 509, 511 (La.App.1936).

The article is no less valid because it is explicitly directed at the suppliers of blood and blood components. Article 4, § 4 of the Louisiana Constitution prohibits the granting of special immunity for "any corporation, association or individual." The article has been narrowly construed by the Louisiana courts, which have held that "A statute which is applicable to all persons under like circumstances and does not subject any individual to an arbitrary exercise of power does not violate the due process or equal protection clauses of the state and federal constitutions." Standard Homestead Ass'n v. Horvath, 205 La. 520, 17 So.2d 811, 813 (1944). Thus, as long as a privilege or immunity "operates equally and fairly to those who engage in like trans-

graph is a property right which, on the death of the survivor in whose favor the right of action survived, is inherited by his legal, instituted, or irregular heirs, whether suit has been instituted thereon by the survivor or not.

As used in this article, the words "child", "brother", "sister", "father", and "mother" include a child, brother, sister, father, and mother, by adoption, respectively. (Amended by Acts 1948, No. 333, § 1; Acts 1960, No. 30, § 1.)"

10. Art. 1, § 2 of the Louisiana Constitution of 1921 provides in full:

"Section 2. No person shall be deprived of life, liberty or property, except by due proc-

ess of law. Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid."

11. Art. 4, § 4 of the Louisiana Constitution of 1921 provides in pertinent part:

"Section 4. The Legislature shall not pass any local or specific law on the following specified subjects:

\*　　\*　　\*　　\*　　\*　　\*

"Granting to any corporation, association, or individual any special or exclusive right, privilege or immunity."

actions" and "affects alike all persons pursuing the same business under the same conditions," the Louisiana Constitution is satisfied. *Id.* at 814. *See, also,* Succession of Vincent, 229 So.2d 449 (La. App., 1969). In the case before us, "[t]he law in question involves all within the class of selling or distributing blood or plasma equally and . . . [t]here appears to be no discrimination in the law favoring the [defendant] *per se* . . .," McDaniel v. Baptist Memorial Hospital, *supra,* 469 F.2d at 235. Because the article applies with such generality to *all* those who provide the vital medical service of supplying blood and blood components—such as blood banks, hospitals and the like—it easily satisfies the well-established tests of constitutionality as a valid exercise of legislative authority.

In conclusion, the only cause of action available to the plaintiffs in this case is negligence, and because the trial court did not pass on the issue and because it is clear that the defendants are no longer immune from liability in negligence, the case is remanded to the trial court for further proceedings on that issue.

Affirmed in part, reversed in part and remanded.