**Diamond Hotel Co., Ltd.**,
Plaintiff/Cross-Defendant/Appellant,
v.
Elizabeth Blanco **Matsunaga**,
Defendant/Cross-Claimant/Appellee.
Appeal No. 93-023
Civil Action No. 92-0426
January 19, 1995

Argued and Submitted January 31, 1994

Counsel for appellant: Juan T. Lizama, Saipan.

Counsel for appellee: Douglas F. Cushnie, Saipan.

Counsel for amici curiae Saipan Bankers Association
and Hotel Association of the Northern Mariana Islands:
John F. Biehl and David R. Nevitt, Saipan (Carlsmith,
Ball, Wichman, Murray, Case, Mukai & Ichiki), and
David A. Wiseman, Saipan.

BEFORE: DELA CRUZ, Chief Justice, ATALIG,
Justice, and KING, Special Judge.

DELA CRUZ, Chief Justice:

The Diamond Hotel Co., Ltd. ("Diamond Hotel")
appeals from a Superior Court order denying its motion
for partial summary judgment and granting Elizabeth
Blanco Matsunaga's ("Matsunaga") cross-motion for
partial summary judgment. The court held that the lease
agreement at issue violated Article XII of the Constitu-
tion ("Article XII") of the Commonwealth of the North-
ern Mariana Islands ("CNMI"). On that basis, it de-
clared the lease void ab initio.

■ The issue we address is whether an option to
extend a fifty-five year lease is a "renewal right" creating
an impermissible long-term interest in land, even if the
option is conditioned on the law being changed. We
have jurisdiction over this appeal pursuant to 1 CMC §
3102.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Manases B. Matsunaga ("Manases"), a person of
Northern Marianas descent ("NMD"), owned Lots 380 B-
NEW-1, 380 B-NEW-2 and 380 B-NEW-3, situated at
Susupe, Saipan. On November 10, 1986, Manases and
the Diamond Hotel entered into the lease agreement
("lease agreement" or "agreement") that is the subject of
this dispute.

Paragraph 3 of the lease agreement provides:

> Term. The leasehold period shall be for a
> term of fifty five (55) years beginning upon
> execution of the AGREEMENT, except as
> provided in paragraph 21, below. TENANT
> shall have the right to terminate this AGREE-
> MENT upon giving LANDLORD one (1) year
> written notice.

Excerpts of Record at 11. Paragraph 21 of the lease
agreement provides that the lease term may be increased
by the Diamond Hotel for up to thirty-five years, but
only if the law is changed to permit such extension:

> Tenant's Future Right to Greater Estate. It
> is understood and acknowledged that under the
> existing law of the [CNMI], the TENANT
> cannot hold any interest in the premises greater
> than the leasehold granted hereby. However, it
> is agreed and understood between the parties
> that if at any time in the future the law of the
> [CNMI] should be changed so as to permit the
> TENANT to hold a term of years greater than
> fifty-five (55), then in that event, TENANT at
> its sole option, may extend the term for the
> duration allowable, provided, however, that the
> entire lease term under this AGREEMENT
> cannot be extended to exceed ninety (90) years
> (original 55 year term plus 35 years extension).
> The terms of this paragraph shall apply to each
> and every change in the law of the [CNMI],
> whenever the change shall occur.

*Id.*

Manases subsequently died. His sister, Matsunaga,
succeeded him to all rights in and title to the leased
premises.

On April 15, 1992, the Diamond Hotel filed a
complaint against Matsunaga for declaratory judgment.
In particular, it sought declaratory relief that the option
to extend the lease term did not violate Article XII.
Matsunaga counterclaimed for declaratory relief and

unpaid rent. She alleged that the lease agreement violated Article XII, and was void ab initio. Diamond Hotel and Matsunaga each moved for partial summary judgment on the Article XII issue.

The Superior Court ruled that paragraph 21 of the lease agreement constituted a renewal right to extend the lease term beyond fifty-five years. It held that the Diamond Hotel, not being an NMD, acquired an impermissible long-term interest in the property and that the lease agreement violated Article XII. This appeal followed, pursuant to certification by the trial court. Com. R. Civ. P. 54(b).

## II. ISSUE AND STANDARD OF REVIEW

The principal issue raised for our review is whether the option to extend the lease constitutes a "renewal right" as that term is used in Article XII, § 3, that, in combination with the fifty-five year lease term, renders the lease agreement violative of Article XII. If it is, then we go on to review whether the option is severable from the rest of the lease agreement. We review orders granting summary judgment de novo. *Santos v. Santos*, 4 N.M.I. 206, 209 (1995).

## III. DISCUSSION

### A. The Option to Extend the Lease Term beyond Fifty-Five Years

The Diamond Hotel argues that the lease agreement does not violate Article XII because the option to extend the lease term given in paragraph 21 does not involve an acquisition of an interest in land. It asserts that the option does not constitute a "renewal right" prohibited by Article XII because: (a) it is not a "presently existing" right to renew, but rather a conditional one; (b) the condition is based on an attenuated event over which the parties have no control, i.e., a change of law; and (c) the option, not having been exercised, is not a true "renewal right." The Diamond Hotel therefore contends that the lease agreement is valid and the summary judgment should be reversed.

In response, Matsunaga contends that the option to extend the fifty-five year lease for an additional thirty-five years creates an impermissible "long-term interest in real property" as that term is used in Article XII, § 1. She contends that the option is a "renewal right" which invalidates the lease agreement. She asserts that, although conditional, the option is a "renewal right"

contemplated by Article XII, § 3.[1] We agree with Matsunaga: the option is a renewal right, notwithstanding that its exercise is conditioned on a future change in the law. We examine what is meant by the term "renewal right" by first briefly tracing the history of and purpose behind Article XII.

Land is a scarce Commonwealth resource. It has been referred to as the "cultural anchor" of the local Chamorro and Carolinian people. *Wabol v. Villacrusis*, 958 F.2d 1450, 1461 (9th Cir. 1992), *cert. denied sub nom., Philippine Goods, Inc. v. Wabol*, 506 U.S. 1027, 113 S. Ct. 675, 121 L. Ed. 2d 598 (1992). "Land is the only significant asset of the Commonwealth people." *Id.*, citing Northern Marianas Constitutional Convention, ANALYSIS OF THE CONSTITUTION OF THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS (Dec. 6, 1976) ("ANALYSIS"). The constitutional restrictions on land alienation imposed by Article XII were intended as a safeguard for the people of the Northern Mariana Islands from losing control over this resource for a limited period (twenty-five years) during the Commonwealth's transition to membership in the American political family. The policy underlying these ownership restrictions is set forth in Covenant § 805.[2] Article XII implemented this policy.

The U.S. Constitution's equal protection clause does not bar the application of Article XII.[3] *Wabol*, 958 F.2d 1450. The U.S., we note, agreed on the protections embodied in Article XII during Covenant negotiations.[4] Because of its ethnic-based prohibition on the sale and transfer of ownership of land, Article XII is indeed unique in American jurisprudence. However, the

---

[1] N.M.I. Const. art. XII, § 3 states: "The *term* permanent and long-term *interests in real property* used in Section 1 *includes* freehold interests and leasehold interests of more than fifty-five years including *renewal rights* . . . ." (Emphasis added.)

[2] COVENANT TO ESTABLISH A COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS IN POLITICAL UNION WITH THE UNITED STATES OF AMERICA, 48 U.S.C. § 1801 note, *reprinted in* CMC at B-101 et seq. ("Covenant").

[3] "It would be truly anomalous to construe the equal protection clause [of the U.S. Constitution] to force the United States to break its pledge to preserve and protect [Northern Mariana Islands] culture and property." *Wabol v. Villacrusis*, 958 F.2d 1450, 1462 (9th Cir. 1992), *cert. denied sub nom., Philippine Goods, Inc. v. Wabol*, 506 U.S. 1027, 113 S. Ct. 675, 121 L. Ed. 2d 598 (1992).

[4] Covenant, *supra* note 2, § 805.

prohibition was deemed necessary during the Commonwealth's transitional years.

The ANALYSIS further explains the reasoning behind Article XII:

> From the end of World War II to the effective date of the Constitution, the law enforced in the Northern Mariana Islands has forbidden alienation of land to persons not citizens of the Trust Territory of the Pacific Islands. The people of the Northern Mariana Islands have had little opportunity to gain experience in land transactions of the kind that would be necessary to compete effectively against investors from other countries with well-developed economies.
>
> Restrictions on land alienation are necessary to preserve the character and strength of the communities that make up the Commonwealth. The people of the Commonwealth are willing to sacrifice the short-term economic gain that might be achieved by putting their land on the market in order to achieve the longer-term economic and social gain that will come from preserving their family and social order, thus protecting the basis for enduring economic growth. The people are willing to take the time to learn how best to use their land, and to develop complete land use plans and comprehensive zoning regulations. These tools will be necessary to regulate the use of land in the · Commonwealth and restrictions on land alienation will provide the necessary time to develop and enact these protections.
>
> The Commonwealth is new. The people have had little experience in self-government. It is a more prudent course to proceed carefully, accepting change only as it proves of long-term benefit to the Commonwealth as a whole. It is necessary to construct certain safeguards at the outset of the Commonwealth government to ensure that the change in the political order is supported by stability in the social order.

*Id.* at 166-67.

■ Article XII thus reflects the judgment of the framers that NMDs must "take the time" to "learn how best to use their land." The objective of the law is to prevent the native Chamorros and Carolinians from losing possession of and control over their most scarce resource, land. The mechanism for achieving this is by restricting, during the period of protection, the transfer of land ownership and by prohibiting non-NMDs from acquiring more than a fifty-five year leasehold interest in

Northern Marianas land. The transfer of a right that empowers a non-NMD to acquire an interest in land beyond a fifty-five year leasehold, as, for example, through an option to renew or to extend, would contravene the purpose of Article XII and would, therefore, be invalid. *See, e.g., Wabol,* 958 F.2d 1450.

■ While the intent of Article XII may appear paternalistic, it was necessary, from an islander's standpoint, to ensure that NMDs have the opportunity to gain experience in land transactions. In light of these considerations, we shall broadly construe the term "renewal rights" as that term is used in Article XII, § 3, to include any right, conditional or unconditional, that a non-NMD could exercise to acquire a leasehold interest in land exceeding fifty-five years. As we shall explain, a conditional option like the one here is a renewal right contemplated and prohibited by Article XII.

Article XII, § 1 restricts the "acquisition" of "permanent and long-term interests in real property" to NMDs. Article XII, § 3 states: "The *term* permanent and long-term *interests in real property* used in Section 1 *includes* freehold interests and leasehold interests of more than fifty-five years including *renewal rights.*" (Emphasis added.)

■ The paragraph 21 option to extend the lease term, like other options used in lease agreements, is in the nature of a contract. RESTATEMENT (SECOND) OF CONTRACTS § 25 (1981). As with other contracts, the duty to perform under an option may be based on a condition. *Id.* § 224. It is true that until it is exercised an option conveys nothing. However, the principal function of an option contract is to "limit[] the promisor's power to revoke an offer." *Id.* § 25 cmt. d. Although the Diamond Hotel's option to extend the lease is conditional, paragraph 21 of the agreement clearly grants the hotel the power to control Matsunaga's ability to dispose of her reversionary interest in the land. The option, which is contractual, gives the Diamond Hotel what it bargained for: a legally-enforceable limitation on Matsunaga's power to lease the property to any party, other than itself, for thirty-five years beyond the fifty-five year lease term. Article XII was designed to prohibit such an arrangement. Thus, in this respect, the paragraph 21 option is in the nature of a renewal right.

■ Renewal rights are expressly included in the calculus of "interests in real property" under Article XII. They cannot be used to increase a non-NMD's interest in land beyond a fifty-five year leasehold. Because the option given the Diamond Hotel to extend the fifty-five year lease term may only be exercised in the event the law later changes to permit the extension, we examine whether this condition somehow makes the option not a "renewal right" prohibited by Article XII, § 3. Although

we agree with the Diamond Hotel that the option to extend does not now constitute a conveyance of an interest in land, we focus on whether the option, though conditional, is a "renewal right" contemplated by Article XII, § 3 that, together with the fifty-five year lease, creates an impermissible "long-term interest[] in real property" as that term is used in Article XII, §§ 1 and 3.

Article XII was designed not only to prevent a non-NMD from actual acquisition of a lease-hold interest beyond fifty-five years, but also to prohibit a non-NMD from holding any right or power that would allow it to later acquire a leasehold interest in land in excess of fifty-five years. Paragraph 21 presently gives the Diamond Hotel the right, "at its sole option" and upon the occurrence of a certain condition, to extend the lease agreement beyond the fifty-five year limitation. Although the right to extend is conditioned on a change of law that has not yet occurred, that fact alone does not make the renewal right something other than a renewal right. While the Diamond Hotel's right to exercise the option to extend is not presently enforceable, Matsunaga remains under a duty to refrain from selling or encumbering her remainder interest in the fee.[5] The fact that the option is conditional does not extinguish the rights and duties created by the paragraph 21 option.[6]

---

[5] "A contractual promise may not yet be enforceable, while at the same time the legal duty that it created may not yet be discharged." Arthur L. Corbin, CORBIN ON CONTRACTS ["CORBIN"] § 630 (1962).

[6] CORBIN, *supra* note 5, is instructive:

It is clear that the fact that rights are future and conditional does not prevent their recognition and protection; they are within the protection of the Constitutional provision against impairment of obligation by a State. A contract creating such rights is legally effective according to its terms; if the payment of money is promised therein, to either the promisee or a third party beneficiary, the existence of a "contract right" is not denied merely because the money is payable in the future and only on the happening of an uncertain event or because some one has a power of termination or modification. If a right has to be "vested" in order to be recognized and protected, these rights are vested. It is immaterial whether the parties "expect" or "hope" that payment will take place. The holder of a fire insurance policy very seldom gets the money promised him, and yet he is not disappointed in his "expectations." He both hopes and expects that his house will *not* burn down; yet no one doubts that he has "rights" created by the policy contract.

We are not persuaded by the argument that the option is not a renewal right because it has not been exercised and because it is based on a condition that is "attenuated." The option to extend at issue already imposes a limitation on Matsunaga's power to lease the land to anyone beyond the Diamond Hotel's fifty-five year leasehold interest. The renewal right given the Diamond Hotel in paragraph 21 precludes Matsunaga from disposing of her reversionary interest to a third party.

Renewal rights permitting the future acquisition of an interest in land for more than fifty-five years are prohibited. Whether the renewal right is conditional or not is not determinative for purposes of Article XII analysis. What is critical is that the right to renew beyond fifty-five years has already been given the Diamond Hotel.

The rule cannot be otherwise. The purpose of Article XII is to furnish substantive protection to NMDs, to further the preservation of their culture, and to protect the underlying social order of the Northern Mariana Islands. Any agreement by which a non-NMD is given, receives, or obtains a right, conditional or otherwise, to acquire title to or an interest in land longer than a fifty-five year leasehold, would violate Article XII.

We therefore hold that the option given the Diamond Hotel to extend its fifty-five year lease is a renewal right, and that the option created a violation of Article XII since it gave the Diamond Hotel an "interest in land" beyond a fifty-five year leasehold. We go on to analyze whether the option to extend the lease may be severed from the lease agreement pursuant to the agreement's severability clause, or whether the entire lease agreement should be declared void ab initio.

## B. The Issue of Severability

The Diamond Hotel contends that if the option to extend the lease offends Article XII, it is severable from the lease agreement. As we have determined earlier, the option to extend the lease offends Article XII because it provides for the extension of the lease beyond fifty-five years. The Diamond Hotel asserts that the fifty-five year lease agreement should be allowed to survive because the parties mutually agreed to sever the option if it was determined to be unlawful.

Matsunaga, on the other hand, contends that *Wabol* controls our analysis. Like the lease and option to renew in *Wabol*, which were determined to be a single transac-

---

*Id.* § 626.

tion and therefore illegal, she argues that the option in this case is inseparable from the rest of the lease agreement. She maintains that the entire lease agreement constitutes one transaction and should be declared void ab initio.

## 1. The Constitutional Remedy

Article XII's "enforcement" section states: "Any transaction made in violation of Section 1 shall be void ab initio." Article XII § 6. Article XII, § 1 states that the "acquisition of permanent and long-term interests in real property within the Commonwealth shall be restricted to persons of Northern Marianas descent."

 Article XII, § 6 "means what it says." *Wabol*, 958 F.2d at 1462. "The drafter's intent could not be clearer; any transaction which violates section 1 is completely without force and effect. The language of section 6 admits of no equitable exceptions." *Id*.

In this case, if the option given under paragraph 21 is an integral part of the lease agreement, we must declare the entire agreement void ab initio, notwithstanding the severability clause. If, however, the option is not an integral part of the lease, and is separable from the rest of the lease, then we examine whether the option, as the offending provision, may be severed and removed from the lease agreement without offending Article XII.

## 2. The Wabol Decision

Matsunaga asserts that the appellate decisions in *Wabol* foreclose severance of the offending option provision. We have carefully reviewed the opinions of the appellate courts in *Wabol* and find that case distinguishable from the case before us.

### a. Trial Court and Appellate Division's Opinions

In *Wabol*, the parties executed a lease for thirty years with an "option to extend" the lease for two additional ten-year periods. *Wabol v. Muna*, 2 CR 231, 236 (N.M.I. Trial Ct. 1985), *rev'd in part*, 2 CR 963 (D.N.M.I. App. Div. 1987), *aff'd sub nom.*, *Wabol v. Villacrusis*, 958 F.2d 1450 (9th Cir. 1990), *cert. denied sub nom.*, *Philippine Goods, Inc. v. Wabol*, 506 U.S. 1027, 113 S. Ct. 675, 121 L. Ed. 2d 598 (1992). At the time, a non-NMD could only hold a maximum lease of forty years in Northern Mariana Islands land. The trial court in *Wabol* stated: "To put it in the terms of Article XII, the lessee has a leasehold interest for 50 years

including renewal rights." *Wabol v. Muna*, 2 CR at 236-37. It then reformed the option provision of the lease agreement, reducing it to allow for only a ten-year option so that the entire interest under the option and basic lease term totaled forty years. *Id*. at 254-55.

In reversing the remedy fashioned by the trial court, the Appellate Division of the U.S. District Court for the Northern Mariana Islands stated that a "number of cases cited by the appellants support the proposition that a lease can't be divided." *Wabol v. Muna*, 2 CR at 971 (citing *Hedges v. Dixon County*, 150 U.S. 182, 192, 14 S. Ct. 71, 74, 37 L. Ed. 1044 (1893), *Eliason v. Eliason*, 443 P.2d 884 (Mont. 1968), and *Parthey v. Beyer*, 238 N.Y.S. 412 (App. Div. 1930)). Viewing the lease agreement, including the option, as constituting a single transaction for purposes of Article XII, the Appellate Division declared the entire agreement void ab initio.

We have examined the cases cited by the Appellate Division and are not satisfied that they stand for the proposition that a lease and the option therein are *always* inseparable. The first case, *Hedges*, concerned a constitutionally defective bond issue by a county government. *See* 150 U.S. at 182, 14 S. Ct. at 71. *Hedges* did not involve a lease.

*Eliason*, the second case relied upon by the Appellate Division, did not involve a lease with an option to renew. *See* 443 P.2d at 885-87. It concerned a lease without an option that was found to be in violation of a Montana statute prohibiting long-term agricultural leases.

*Parthey*, the third case cited by the Appellate Division, also concerned an illegal agricultural lease. The lease in *Parthey*, however, did include an option to purchase the fee. *See* 238 N.Y.S. at 416. The *Parthey* court held that the lease and the option to purchase were not separable because the "consideration for both [the lease and option] is commingled and is not susceptible of being segregated and allocated, part to the option and part to the lease or extension of the existing lease." *Id*. In so holding, the *Parthey* court did not foreclose the possibility of severing a provision in a lease agreement under circumstances that may permit it.

### b. The Ninth Circuit's Decision in Wabol

The Ninth Circuit Court of Appeals held in *Wabol* that "[b]ecause a void instrument cannot be *reformed*, *Hedges v. Dixon County*, 150 U.S. 182, 192, 14 S. Ct. 71, 74 (1893), the district court properly held that the lease was invalid." 958 F.2d at 1463 (emphasis added). The court relied on *Hedges* alone as authority for this proposition.

*Hedges* states that "[w]*here a contract is void at law for want of power to make it, a court of equity has no jurisdiction to enforce such contract, or in the absence of fraud, accident, or mistake to so modify it as to make it legal, and then enforce it.*" 150 U.S. at 92, 14 S. Ct. at 74 (emphasis added). This means that a court may not use its equitable powers to reform an instrument which is void by reason of, for example, a statute or a constitutional provision.

■ Here, the Diamond Hotel urges us to sever the option from the rest of the lease agreement pursuant to the severability provision, which allows for severance of any lease provision determined unlawful. In *Wabol*, the Ninth Circuit did not address the question of whether a provision offending Article XII may be severed. There was no severability clause in *Wabol*. The power of a court to sever a lease provision (as, in this case, the lease agreement itself provides for) is distinct from a court's power to reform the express terms of a contract that is otherwise void at law. *See Somerset Importers Ltd. v. Continental Vinters*, 790 F.2d 775, 782 (9th Cir. 1986). Granting the Diamond Hotel's severance request does not involve the exercise of our equitable powers to reform the lease agreement, which is what *Wabol* forbade. Rather, it would enforce the parties' agreement to sever a provision which makes the lease agreement illegal.

■ For the reasons which follow, we hold that an option to renew or extend the lease term may be severed, under appropriate facts, from a lease agreement. We explain why severance of an offending option provision may be permissible under Article XII.

■ In this case, severance of the option to extend which violates Article XII may be made without offending Article XII's void ab initio mandate. First, the parties themselves have agreed to do so. By removing the option provision which makes the lease transaction unlawful, as the parties have mutually agreed to do, the lease remains valid. At least two courts have decided that severance of an illegal term that renders a contract void by statute is permissible to save the agreement. *Mailand v. Burckle*, 572 P.2d 1142, 1152 (Cal. 1978); *Ai v. Frank Huff Agency, Ltd.*, 607 P.2d 1304, 1312-13 (Haw. 1980). We see no distinction between these two cases, which involve statutory violations of California and Hawaii law, and a case where the agreement embodies a transaction that violates a constitutional provision, like Article XII. Article XII, as written, does not preclude severance where the parties have agreed to do so in order to save the underlying lease. By removing the option clause, the lease agreement gives the Diamond Hotel only the maximum leasehold interest it could obtain at law.

The option, in combination with the otherwise valid fifty-five year lease, creates the Article XII violation. The lease instrument, however, provides for the removal of the option, the clause which causes the lease to be unlawful. There is nothing wrong with enforcing the severance clause. We fail to see why severance of the offending option would itself offend Article XII where the parties themselves have agreed to do so, and where the effect of severance would instead provide for only a fifty-five year maximum leasehold that a non-NMD may obtain.

■ Second, a provision in a lease agreement may be severed from the lease if such provision is not integral to the lease agreement and the parties have agreed to severance. "[W]hile there are various tests for determining the nature of a contract as entire or several, there is no formula for a test in all cases, and each case must depend largely on its own circumstances." 17A C.J.S. *Contracts* § 331 (1963). The existence of a severability clause in a lease agreement "certainly strengthens the case for the severance of unenforceable provisions because it indicates that the parties intended for the lawful portions of the contract to be enforced in the absence of the unlawful portions." *Abbott-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1343 (Ill. App. Ct. 1993).

The test employed by one court in determining whether a particular provision is separable and not integral to an agreement is "whether [the parties] would have entered into the agreement absent the illegal parts." *Panasonic Co. v. Zinn*, 903 F.2d 1039, 1041 (5th Cir. 1990). Another court has held that the test of separability of a lease and an option is whether "the agreement [would] have been made were the parties not under the impression that it would be performed in its entirety." *Bonnco Petrol, Inc. v. Epstein*, 560 A.2d 655, 662 (N.J. 1989). At least two courts have found that the doctrine of separability applies to an agreement that contains a lease and an option to obtain a further interest in the leased land. *See In re Guardianship of Sorum*, 273 N.W.2d 710, 712 (N.D. 1979); *Bonnco Petrol, Inc.*, supra.

We therefore examine the lease agreement to determine whether the option is an integral part of it. If it is not an integral component of the agreement, the provision is separable from the lease and may be severed. We find, based on the language of paragraph 21, that the option was not intended to be an integral provision.

The parties in this case intended that the option be separable. Paragraph 34 of the agreement states:

Severability and Choice of Law. This AGREEMENT shall be subject to the laws of the [CNMI], and if any provision of this AGREEMENT shall be held invalid, under those laws for any reason, the same shall be deemed severable from the remainder hereof and shall in no way impair the validity of this AGREEMENT and all remaining provisions of this AGREEMENT shall otherwise remain in full force and effect.

Excerpts of Record at 11. The option provision, paragraph 21, states that the parties "understood and acknowledged that under the existing law of the [CNMI], the TENANT cannot hold any interest in the premises greater than the leasehold granted hereby." *Id.* This statement shows that the parties anticipated that the option provision might violate Article XII. In order to guard against a ruling of illegality, they carefully specified that the lease was to grant only a legitimate interest in the land conveyed. If any lease provision was found to be offensive to Article XII or any other law, that provision was to be removed.

 We conclude that the option to extend the lease may be severed without offending Article XII. By giving effect to the severance clause and removing the offending option, we are enforcing at law, and not reforming, the parties' express agreement. The parties have agreed that the lease agreement should convey only a legal interest in land. The Diamond Hotel's request for severance of the option provision from the rest of the agreement is warranted and should be granted.

## IV. CONCLUSION

Recapping, we hold that the conditional option to extend the lease beyond fifty-five years is a renewal right which creates a violation of Article XII. Not being integral to the lease, however, the option provision is severable from the rest of the lease agreement, pursuant to paragraph 34's severability clause. The fifty-five year lease agreement thus remains valid.

The judgment of the Superior Court is **REVERSED** and the case is **REMANDED** with instructions to enter declaratory judgment consistent with this opinion and also to resolve Matsunaga's unpaid rent claim. Additionally, jurisdiction over the funds now held in account for Matsunaga is hereby vested in the Superior Court.

ATALIG, Justice, concurring:

I concur with the reversal of the partial summary judgment granted in favor of Elizabeth Blanco Matsunaga ("Elizabeth"). However, I disagree with the majority's holdings supporting the reversal.

At issue is whether, under the disputed lease ("lease"), Diamond Hotel Co., Ltd. ("Diamond"), has acquired a constitutionally-impermissible permanent or long-term property interest. The majority holds that under the lease, in particular paragraph 21 together with the initial lease term of fifty-five years in paragraph 3, Diamond acquired a long-term interest in land violative of Article XII, notwithstanding its conclusion that paragraph 21 "does not now constitute a conveyance of an interest in land." It then, however, deems the option clause in paragraph 21 severable, despite the language in paragraph 3 and Article XII § 6, because paragraph 21 "is not an integral component of the [lease]."

I would hold that the lease does not violate Article XII and reverse the trial court's decision. Furthermore, I would hold that the option clause is unenforceable because the undisputed facts of this case evince that it contravenes the strong public policy behind Article XII.

## DISCUSSION

Article XII, § 1 prohibits the acquisition by non-NMDs of permanent or long-term interests in real property in the CNMI. "*Any* transaction made in violation of Section 1 shall be void ab initio." N.M.I. Const. art. XII, § 6, cl. 1 (emphasis added). Whether Diamond acquired a permanent or long-term interest in land under the lease requires us to carefully examine the purported "interest" and, if it is an interest in land, whether there has been an "acquisition" for purposes of Article XII. *See Manglona v. Kaipat*, 3 N.M.I. 322, 333 (1992); *Ferreira v. Borja*, 1 F.3d 960, 962 (9th Cir. 1993) (citing *Ferreira v. Borja*, 2 N.M.I. 514, 540 (1992) (King, S.J., dissenting)), *vacating and remanding* 2 N.M.I. 514 (1992), *opinion on remand*, 4 N.M.I. 211 (1995), *rev'g* 3 CR 472 (N.M.I. Trial Ct. 1988).

I conclude that under the lease Diamond has not acquired a vested renewal right constituting an unconstitutional lease term extension. Hence, Article XII, §§ 1 and 6 are not implicated. At most, Diamond has a conditional option contract right under paragraph 21. However, because the public policy behind Article XII against the alienation of long-term land interests to non-NMDs is both implicated and contravened by that contract right, I conclude that paragraph 21 is unenforceable.

## I. Diamond has not Acquired an Impermissible Long-Term Interest in Real Property under Paragraph 21

Permanent and long-term interests in real property include "freehold interests and leasehold interests of more than fifty-five years including renewal rights." N.M.I. Const. art. XII, § 3, cl. 1 (amended 1985). "Renewal rights are an integral part of a lease and should not be permitted to constitute an extension of the time limitation." Northern Marianas Constitutional Convention, ANALYSIS OF THE CONSTITUTION OF THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS ["ANALYSIS"] 120 (Dec. 6, 1976) (concerning Article XII, § 3). "The term acquisition . . . includes [an] acquisition by sale, lease, gift, inheritance or other means." N.M.I. Const. art. XII, § 2, cl. 1 (amended 1985). The ANALYSIS equates the term "acquisition" with "transfer,"[7] and this Court has previously concluded that only upon a transfer of an interest in land does that interest vest in the recipient. See In re Estate of Deleon Guerrero, 1 N.M.I. 301, 306-07 (1990) (because no interest in land transferred to decedent, no such interest vested in her estate at the time of her death).

Thus, for an impermissible interest in land to have been acquired by Diamond under paragraph 21, that interest must have been transferred to, and, hence, vested in, Diamond. The specific interest must have been one which "constitute[s] an extension" of the lease.[8]

## A. Under the Lease, Elizabeth has not Conveyed a Present or Future Possessory Interest in the Property to Diamond beyond Fifty-Five Years

An effective leasehold, constituting a non-freehold estate for years,[9] transfers a possessory interest in land to the lessee for a fixed term. See and compare RESTATEMENT OF PROPERTY ["PROPERTY"] § 13 & cmt. a (1936);[10] RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT ["LANDLORD AND TENANT"] § 1.2 (1977);[11] Sublett v. City of Tulsa, 405 P.2d 185, 200 (Okla. 1965). This possessory interest may be either present[12] or future,[13] or an aggregate of both. See

---

[7] Northern Marianas Constitutional Convention. ANALYSIS OF THE CONSTITUTION OF THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS [hereinafter ANALYSIS] at 168 (Dec. 6, 1976) (concerning Article XII, § 2).

[8] Because our constitution and other Commonwealth law do not define the terms "acquisition," "transfer," "renewal right," "interest" and "other means," I must look to the Restatements, 7 CMC § 3401. Furthermore, as "[a] lease is both a conveyance of an estate and a contract," In re Wolverton Assocs., 909 F.2d 1286, 1294 (9th Cir. 1990), see also Maui Land and Pineapple Co., Inc. v. Dillingham Corp., 674 P.2d 390 (Haw. 1984), and compare majority opinion, supra, I will look to the pertinent Restatement provisions of real property and contract law. My consideration of contract law under the Restatements is confined to the creation and transfer of interests arising under contractual rights. See In re Estate of Seman, 4 N.M.I. 129, 132 n.11 (1994) (quoting RESTATEMENT (SECOND) OF CONTRACTS [hereinafter CONTRACTS] introduction at 1 (1981)).

[9] "A leasehold is a non-freehold "estate for years." RESTATEMENT OF PROPERTY [hereinafter PROPERTY], introductory note to Division II at 37 (1936). The term "estate," as used in PROPERTY, means "an interest in land which (a) is or may become possessory; and (b) is ownership measured in terms of duration." Id. § 9. "An estate for years is an estate, the duration of which is fixed in units of a year or multiples or divisions thereof." Id. § 19.

[10] Since an interest . . . is a legal relation between two persons . . . it follows that such a relation is necessarily personal. The transaction referred to as a "transfer" from one person to another actually consists of two steps. These are: first, the extinguishment in the transferor of the interests which are the subject matter of the transfer; and second, insofar as the interests thus extinguished are interests good against others than the transferee, the creation in the transferee of similar interests.

Id. § 13 cmt. a.

[11] "A landlord-tenant relationship exists only if the landlord transfers the right to possession of the leased property." RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT [hereinafter LANDLORD AND TENANT] § 1.2 (1977).

[12] "A present interest is an interest in land, or in a thing other than land, which includes . . . a right to the immediate beneficial enjoyment of the affected thing . . . ." PROPERTY, supra note 9, § 153.

[13] (1) . . . [A] future interest is an interest in land, or in a thing other than land, which

 (a) is not, but may become a present interest; and

 (b) is a segment of ownership measured in terms of duration; and

 (c) is neither inchoate dower nor curtesy initiate . . . .

(2) . . . exclud[ing] the interest had by the owner of a postponed right to the enjoyment of an easement, profit, rent or similar interest in the land of another.

PROPERTY § 13 cmt. a; LANDLORD AND TENANT § 1.2 cmt. a.[14] Thus, the "interest" implicated under Article XII with respect to a leasehold is a vested present or future possessory interest. This is distinguishable from a contingent possessory interest. *See Everdell v. Preston,* 717 F. Supp. 1498, 1501 (M.D. Fla. 1989); *cf. infra* note 16 and accompanying text.

A possessory interest is acquired by the transferee under a lease only where that interest has been both extinguished in the transferor and created in that transferee. See sources quoted *supra* notes 10-11. Only then does the landlord-tenant relationship exist. See *supra* note 11. Furthermore, this relationship may be subject to a condition precedent,[15] as well, see LANDLORD AND TENANT § 1.8,[16] in which instance it is only upon the occurrence of the event that the relationship commences. *Id.* § 1.8 cmt. a. In other words, a condition precedent is one which must occur for an interest to vest. *See* RESTATEMENT (SECOND) OF CONTRACTS ["CONTRACTS"] § 224 cmt. a (1981) (a condition precedent "qualifies a transfer of property" under a contract right); *Wien Consol. Airlines, Inc. v. C.I.R.,* 528 F.2d 735, 737 n.4 (9th Cir. 1976) (real property law).

Under paragraph 3 of the lease, Diamond has a present possessory interest in the property for fifty-five years. *Compare* Lease Agreement (Nov. 13, 1986) (*quoted in* majority opinion, *ante*) *with* authority *quoted supra* note 12 *and* PROPERTY § 153 cmts. d, e.[17] How

ever, paragraph 21 vests no present right to future possession in the property beyond that fifty-five year period. *Cf.* LANDLORD AND TENANT § 1.8 cmt. b. This is because until the law is changed and the option exercised, Elizabeth retains that right,[18] and, upon the expiration of the fifty-five year period, the possessory rights now vested in Diamond will revert back to her. *Cf. Ferguson v. District Court of Oklahoma County,* 544 P.2d 498, 499 (Okla. 1975).

B. *Unexercised Option to Extend Lease, Contingent upon Change in Law, does not Vest Interest in Optionee*

As the majority notes, paragraph 21 is, in essence, an option contract, compare CONTRACTS § 125 cmt. c ("promise to transfer" land interest "includes an option contract"), *Duty Free Shoppers Ltd. v. Sablan,* 3 CR 623, 626-27 (N.M.I. Trial Ct. 1989), the main purpose of which is to render an offer irrevocable for a specified period of time. *See* CONTRACTS § 25 & cmt. d; *University Realty & Dev. Co. v. Omid-Gaf, Inc.,* 508 P.2d 747, 749 (Ariz. Ct. App. 1973).

Thus, under paragraph 21, Elizabeth may not revoke her offer to extend the lease, in anticipation of the law changing, until the expiration of the initial fifty-five year lease term. However, Diamond's right to exercise the option is conditioned upon the law being changed, and Elizabeth is under no obligation to extend the lease term until that condition is satisfied. *See supra* note 15; CONTRACTS § 225 ("Performance of a duty, subject to a condition cannot become due unless the condition occurs . . .").

Because Diamond may not unilaterally exercise the option in paragraph 21 prior to any pertinent change in the law, it has not acquired an impermissible long-term interest under Article XII. Rather, it has only an option contract right to a potential future possessory interest in an extension of the leasehold term. This is in accordance with previous case law in this jurisdiction noting that an interest in land is usually acquired by an optionee only

---

*Id.*

[14] "In order to satisfy the possession requirement of the landlord-tenant relationship, the transferred interest in the leased property must be one that the owner is legally capable of possessing now or in the future." LANDLORD AND TENANT, *supra* note 11, § 1.2 cmt. a.

[15] "A condition is an event, not certain to occur, which *must* occur, unless its non-occurrence is excused, before performance under a contract becomes due." CONTRACTS, *supra* note 8, § 224 (emphasis added). This type of condition has been called a "condition precedent." *Id.* cmt. e.

[16] *See also* PROPERTY, *supra* note 9, §§ 19 cmt. c, 26 (conditions may be placed on future possessory interests in non-freehold estate for years); CONTRACTS, *supra* note 8, § 226 (contracts may be conditioned "[b]y the agreement of the parties").

[17] The contrast between "future interests" . . . and "present interests" . . . rests upon the postponement . . . of some of the separate rights, powers or privileges which would be forthwith existent if the interests were "present." Thus a present interest in land is characterized by a right to the possession thereof, but

---

in the case of a future interest in land, this right to possession is postponed to await the ending of one or other interests which include, successively, the right to the possession of such land.

PROPERTY, *supra* note 9, § 153 cmt. e.

[18] Whenever a right of possession "is postponed, it is necessarily true that the right to possession of such land is meanwhile in another." *Id.* § 26 cmt. a.

223

upon the execution of the option. *See Duty Free Shoppers Ltd.*, 3 CR at 626-27.[19] *Accord* majority opinion, *supra. Cf. Wabol v. Muna*, 2 CR 963 (D.N.M.I. App. Div. 1987),[20] *rev'g in part* 2 CR 231 (N.M.I. Trial Ct. 1984), *aff'd sub nom., Wabol v. Villacrusis*, 958 F.2d 1450 (9th Cir.), *cert. denied sub nom., Philippine Goods, Inc. v. Wabol*, 506 U.S. 1027, 113 S. Ct. 674, 121 L. Ed. 2d 598 (1992).[21]

## II. Paragraph 21 Unenforceable under Public Policy

Diamond sought a determination below of its rights and obligations under the lease. This requires an examination of the validity and enforceability of paragraph 21. *Cf. Lucky Dev. Co., Ltd. v. Tokai, U.S.A., Inc.*, 3 N.M.I. 79, 94 (1992) (issues involving validity of an agreement call into question whether agreement is "illegal or contrary to public policy"); CONTRACTS § 8 (breach of unenforceable contracts may not result in either specific performance or damage remedies).

A provision or term that is against public policy may be unenforceable. CONTRACTS § 178(1).[22] Such a public policy may be based on either the constitution, statutes, rules or regulations, see *id.* §§ 179 & cmt. b, 178 cmt. a, or "the need to protect some aspect of the public welfare." *Id.* § 179.[23] Even where a contract provision does not by its terms squarely violate legislation, it may, nevertheless, be unenforceable if it contravenes a public policy behind such legislation. *See, e.g., id.* cmt. b;[24] *Shadis v. Beal*, 685 F.2d 824, 833-34 (3d Cir.), *cert. denied sub nom., O'Bannon v. Shadis*, 459 U.S. 970, 103 S. Ct. 300, 74 L. Ed. 2d 282 (1982).[25]

---

[19] In *Duty Free Shoppers Ltd. v. Sablan*, 3 CR 623 (N.M.I. Trial Ct. 1989), the plaintiff asserted that a one-year period above the constitutional fifty-five year limit during which a non-NMD entity had the option of executing a lease was "in itself equivalent to a leasehold interest," 3 CR at 626-27, and should be tacked on to the lease term. While the court noted that the plaintiff was paid to not otherwise lease or alienate the property within that one-year period, the defendant had received no interest or estate in the land by virtue of the unexercised option. *Id.*

[20] In *Wabol v. Muna*, 2 CR 963 (D.N.M.I. App. Div. 1987), *rev'g in part* 2 CR 231 (N.M.I. Trial Ct. 1984), *aff'd sub nom., Wabol v. Villacrusis*, 958 F.2d 1450 (9th Cir.), *cert. denied sub nom., Philippine Goods, Inc. v. Wabol*, 506 U.S. 1027, 113 S. Ct. 674, 121 L. Ed. 2d 598 (1992), the Appellate Division found that a thirty-year leasehold with an option to renew for twenty years violated Article XII. However, in that case there was no condition precedent on which the right to exercise the option stood. *See Wabol*, 2 CR at 970; *see also* Lease Agreement ¶ 3 (Aug. 18, 1978), *in* Complaint at Exhibit 1, *Wabol*, Civ. No. 84-0397 (N.M.I. Super. Ct. filed Oct. 17, 1984) ("Lessor *grants* to Lessee the option to extend the length of this lease for an additional term of twenty (20) years") (emphasis added). Thus, for purposes of Article XII, the lessee "acquired" an impermissible leasehold interest. *See id.* Here, the exercise of the option is *not* solely within Diamond's control. It is expressly conditioned upon the law changing, making any current expectation of a future lease term extension untenable.

[21] *Cf. also El Paso Natural Gas Co. v. Kysar Ins. Agency, Inc.*, 605 P.2d 240, 244 (N.M. Ct. App. 1979) (only upon the exercise of an option does a lessee acquire "any equitable interest and rights in the property"); *Stenke v. Masland Dev. Co., Inc.*, 394 N.W.2d 418, 422 (Mich. Ct. App. 1986) ("holder of an option to purchase land does not have an interest in the premises, either legal or equitable").

[22] *Cf.* LANDLORD AND TENANT, *supra* note 11, § 5.6 cmts. e, f. "Enforcement will be denied only if the factors that argue against enforcement clearly outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the particular term." CONTRACTS, *supra* note 8, § 178 cmt. b. *See id.* § 178(2) (factors pertinent to "weighing the interest in the enforcement of a term").

[23] A court will determine that a given term is unenforceable on public policy grounds "derived either from [our] perception of the need to protect some aspect of the public welfare or from legislation that is relevant to that policy although it says nothing explicitly about unenforceability." CONTRACTS, *supra* note 8, § 178 cmt. b (citing *id.* § 179). Compare LANDLORD AND TENANT, *supra* note 11, § 5.6 cmt. e, under which a lease provision "may be against public policy if it will materially and unreasonably obstruct achievement of a well defined statutory, regulatory, or common law policy."

[24] "[E]ven though a field is a subject of legislation, a court may decide that the legislature has not entirely occupied the field and may refuse to enforce a term on grounds of a judicially developed public policy even though there is no contravention of the legislation." CONTRACTS, *supra* note 8, § 179 cmt. b. Such a determination of enforceability is to be made with respect to the policy at the time of the contract and is not usually affected by subsequent factual or legal changes. *Branch v. Mobil Oil Corp.*, 772 F. Supp. 570, 571 (W.D. Okla. 1991) (citing *Sabine Corp. v. ONG Western, Inc.*, 725 F. Supp. 1157, 1183 (W.D. Okla. 1989)) (quoting CONTRACTS § 179 cmt. d).

[25] [T]he scope of the public policy doctrine is broader and more encompassing than the concept of illegality. . . . The Restatement obviously does not require that the legislation in question expressly prohibit or require an act inconsistent with the contract; it is sufficient if the legislature makes an adequate declaration of public policy which is inconsistent with the

In determining the unenforceability of the option clause under the lease, we utilize and weigh the factors enunciated in CONTRACTS, under which we examine:

> (a) the strength of that policy as manifested by legislation or judicial decisions,
>
> (b) the likelihood that a refusal to enforce the term will further that policy,
>
> (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and
>
> (d) the directness of the connection between that misconduct and the term.[26]

*Id.* § 178(3).

I conclude that the option clause gives a contractual right to Diamond contrary to a public policy against the alienation of long-term real property interests by NMDs to non-NMDs. Furthermore, I would hold that paragraph 21 is unenforceable in light of the strength of, and in the interest of the furtherance of, that policy.[27] However, I would remand for trial on the issues of severability and enforceability of the remaining lease provisions.[28]

---

contract's terms.

*Shadis v. Beal*, 685 F.2d 824, 833-34 (3d Cir.) (citing CONTRACTS, *supra* note 8, §§ 178, 179 & cmt. b) (footnote omitted), *cert. denied*, 459 U.S. 970, 103 S. Ct. 300, 74 L. Ed. 2d 282 (1982).

[26] Neither party contends, nor did the court find, that misconduct was involved on the part of Manases and/or Diamond in executing the lease.

[27] I would thus rule, despite factual issues in the balancing test, because even assuming that there was no misconduct at all on the part of Diamond, the strength of the policy behind Article XII, which does not consider misconduct, overwhelms the other two factors.

[28] I would decline to rule on the severability of the option provision for purposes of determining if the remaining lease provisions are enforceable because the tests implicated, unlike that under CONTRACTS, *supra* note 8, § 178, involve disjunctive factual issues, under any one of which enforceability is at stake, not litigated below. *Compare id.* §§ 183, 184, *with Fountain v. Filson*, 336 U.S. 681, 69 S. Ct. 754, 93 L. Ed. 971 (1949) (entry of reversal of summary judgment by appellate court deprived defendant of opportunity to dispute facts pertinent to issue on which court resolved matter), *and Heirs of Fruge v. Blood Servs.*, 506 F.2d 841 (5th Cir. 1975) (appellate court may not extend judgment on appeal from summary judgment to another issue under the guise of affirmance, when effect is to

Article XII's clear prohibition against the acquisition of permanent and long-term real property interests by non-NMDs is an extension of the long-standing public policy in the CNMI and Micronesia against the alienation of land to, and exploitation of NMDs by, non-NMDs. As far back in time as the German administration (1898-1914), the administering authorities in the CNMI have regulated the alienation of real property interests held by the indigenous population. It was presumed that these people were neither legally nor economically sophisticated enough to prevent the loss of their land. *See, e.g.,* Statement of Baron Nobuaki Makino, *quoted in* Don A. Farrell, HISTORY OF THE NORTHERN MARIANA ISLANDS 302-303 (Phyllis Koontz ed., 1991);[29] *see also* League of Nations, MANDATE FOR THE GERMAN POSSESSIONS IN THE PACIFIC OCEAN LYING NORTH OF THE EQUATOR art. II (Dec. 17, 1920) (copy on microfilm with CNMI Archivist);[30] Japanese Government, ANNUAL REPORT TO THE LEAGUE OF NATIONS ON THE ADMINISTRATION OF THE SOUTH SEA ISLANDS UNDER JAPANESE MANDATE FOR THE YEAR 1932 chap. VII, §§ I at 112 (continuing

---

preclude losing party from disputing facts material to the claim). As such, I would remand the matter for a determination on severability. *See, e.g., In re Guardianship of Sorum,* 273 N.W.2d 710, 712 (N.D. 1979) (*cited in* majority opinion, *supra*); *Bonnco Petrol, Inc. v. Epstein,* 560 A.2d 655, 662 (N.J. 1989) (after concluding contract clause illegal, court remands to determine severability) (*cited in* majority opinion, *supra*).

[29] Arguing in support of Japan's claim to Micronesia during 1919 peace negotiations, Japan's chief delegate to the League of Nations stated:

> [The Micronesians] still remain in a primitive state and have no ability to establish political, economic, and social organizations, in a modern sense, by themselves. . . . [I]t is necessary [for Japan] . . . to continue to protect these islanders and to improve their living conditions by making her possession of these islands definite.

Statement of Baron Nobuaki Makino, *quoted in* Don A. Farrell, HISTORY OF THE NORTHERN MARIANA ISLANDS 302-03 (Phyllis Koontz ed., 1991).

[30] "The Mandatory shall promote to the utmost the material and moral well-being and the social progress of the inhabitants of the territory subject to the present mandate." League of Nations, MANDATE FOR THE GERMAN POSSESSIONS IN THE PACIFIC OCEAN LYING NORTH OF THE EQUATOR art. II (Dec. 17, 1920) (copy on microfilm with CNMI Archivist).

German policy of protecting local land owners),[31] II(b) at 115 (requiring approval by Director of the South Seas Bureau of any acquisition of land interest from "natives") (copy on microfilm with CNMI Archivist);[32] United Nations, TRUSTEESHIP AGREEMENT FOR THE FORMER JAPANESE MANDATED ISLANDS (1947), *reprinted in* CMC at A-201 et seq. (*cited in Wabol*, 958 F.2d at 1458, 1461); Office of the High Commissioner, Trust Territory of the Pacific Islands, Land Management Regulation No. 4, § 4 (1965) (copy on microfilm with CNMI Archivist);[33] and A BILL FOR AN ACT RELATING TO THE ESTABLISHMENT OF THE DIVISION OF LAND MANAGEMENT (supporting statement submitted by Robert K. Shoecraft, Attorney General, and Paul L. Winsor, Assistant Commissioner for Resources and Development) (copy on microfilm with CNMI Archivist).[34] *See generally* Howard P. Willens & Deanne C. Siemer, *The Constitution of the Northern Mariana Islands: Constitutional Principles and Innovation in a Pacific Setting*, 64 GEO. L.J. 1373, 1406 (1977) (quoting *Hearings on H.R. Res. 549 Before the Senate Comm. on Foreign Relations*, 94th Cong. 1st Sess. 164 (1975)) (*cited in Wabol*, 958 F.2d at 1461).

The people of the CNMI, through the COVENANT TO ESTABLISH A COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS IN POLITICAL UNION WITH THE UNITED STATES OF AMERICA ["Covenant"] § 805, 48 U.S.C. § 1801 note, *reprinted in* at CMC at B-116,[35] and

---

[31] With regard to the land system, no detailed Regulations have as yet been enacted, but rights already acquired on land in accordance with old customs or German Laws are generally recognized irrespective of whether their owners are natives or not and owners are free to dispose of their land in whatever way the choose. *However, a policy adopted under the German regime to protect native land-owners is still followed, placing restrictions upon the disposal of land, the property of natives, until a definite land system will be established.*

Japanese Government, ANNUAL REPORT TO THE LEAGUE OF NATIONS ON THE ADMINISTRATION OF THE SOUTH SEA ISLANDS UNDER JAPANESE MANDATE FOR THE YEAR 1932 chap. VII, § I (copy on microfilm with CNMI Archivist) (emphasis added).

[32] Private land, the property of natives, is dealt with in law in a different way from such as is the property of persons other than natives . . . . [I]t is prohibited to sell, or transfer it to, or to enter into agreements making it the object of security with parties other than the Government, unless sanctioned by the Director of the South Seas Bureau . . . . [and] unless sanctioned . . . . no agreement (except between natives) between Japanese or foreigners and natives concerning land, such as the grant of a lease, other than an agreement entered into for the purpose of selling, transferring or making it the object of security, is valid. . . . This system is aimed in the interest of natives at the prevention of the undue decrease of land owned by them as well as of any loss accruing to them from their lack of economic and legal knowledge when they may chance to deal in land with persons other than natives.

*Id.* § II(b) at 115-16 (citing appended regulations concerning land owned by natives and contracts concluded with natives). While this language is patently ambiguous, a full reading thereof and other primary sources from this period show that the Japanese policy was to proscribe the alienation of land held by natives with respect to non-natives, unless sanctioned by the Director. *See, e.g., supra* note 31.

[33] [N]o acquisition of interest in real property by persons who are not citizens of the Trust Territory, or by a foreign corporation or any corporation or association in which an alien owns any interest, shall be valid without the prior written approval of the High Commissioner.

Office of the High Commissioner, Trust Territory of the Pacific Islands, Office of Land Management Regulation No. 4 § 4 (1965) (copy on microfilm with CNMI Archivist).

[34] The Division [of Land Management] shall direct itself toward economic development through the optimum use of land-based resources which shall entail development and supervision of comprehensive land management programs to assure that maximum returns in economic and financial benefits will accrue to Micronesians and their Government. Program emphasis of a high order will be placed on land tenure problems and land utilization. It is recognized that skilled land management and subsequent development is vital to the economic well being of Micronesia.

A BILL FOR AN ACT RELATING TO THE ESTABLISHMENT OF THE DIVISION OF LAND MANAGEMENT (supporting statement submitted jointly by Robert K. Shoecraft, Attorney General, and Paul L. Winsor, Assistant Commissioner for Resources and Development) (copy on microfilm with CNMI Archivist).

[35] [T]he Government of the Northern Mariana Islands, in view of the importance of the ownership of land for the culture and traditions of the people of the Northern Mariana Islands, and in order to protect them against exploitation and to promote their economic advancement and self-sufficiency:

(a) will until twenty-five years after the

Article XII, decided to continue this public policy against the alienation of long-term property interests to non-NMDs.[36] This policy, as maintained by the CNMI, incorporates a recognition of the scarcity of land and its importance in local traditions and customs. *See, e.g.,* ANALYSIS at 164-65 (concerning Article XII, § 1) (*quoted in Guerrero v. Guerrero,* 2 N.M.I. 61, 70 (1991));[37] *see also Commonwealth v. Bordallo,* 1 N.M.I. 208, 218-19 (1990) (citing Covenant § 805 and noting importance of land ownership "in relation to the culture

termination of the Trusteeship Agreement, and may thereafter, regulate the alienation of permanent and long-term interests in real property so as to restrict the acquisition of such interests to persons of Northern Mariana Islands descent . .
. .

COVENANT TO ESTABLISH A COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS IN POLITICAL UNION WITH THE UNITED STATES OF AMERICA § 805, 48 U.S.C. § 1801 note, *reprinted in* CMC at B-116.

[36] *See, e.g.,* Howard P. Willens & Deanne C. Siemer, *The Constitution of the Northern Mariana Islands: Constitutional Principles and Innovation in a Pacific Setting,* 64 GEO. L.J. 1373, 1406 (1977) (quoting *Hearings on H.R. Res. 549 Before the Senate Comm. on Foreign Relations,* 94th Cong. 1st Sess. 164 (1975)).

[37] The Convention's purpose in implementing the restrictions on land alienation is to protect the culture and traditions of the people of the Northern Mariana Islands, to promote the political growth needed in the first critical years of the Commonwealth, to accomplish the political union with the United States with a minimum of cultural and economic dislocation, and to provide . . . stability. . . .

. . . .

. . . Land is one of the principal sources of social stability. It gives root to the pride, confidence and identity as a people that will permit the cooperative action necessary to a successful Commonwealth. If the land passes out of the hands of the people of the Northern Mariana Islands, these unique social and economic benefits will be lost.

Land is the only significant asset that the people of the Commonwealth have. . . . [It] is the basis of family organization in the islands. It traditionally passes from generation to generation creating family identity and contributing to the economic well-being of family members.

ANALYSIS, *supra* note 7, at 164-65 (concerning Article XII, § 1) (*quoted in Guerrero v. Guerrero,* 2 N.M.I. 61, 70 (1991)).

and traditions of" NMDs), *opinion on remand,* 2 N.M.I. 226 (1991).

While the level of sophistication of NMDs has increased, so have the complexities of the legal and economic dynamics behind the purchasing and leasing of land. Thus, the public policy implicated in Article XII is still viable. *Cf., e.g.,* PL 8-32 (codified at 2 CMC §§ 4941-4942, 4951, 4961-4963, 4971-4973, 4981-4982, 4991-4992, and amending 7 CMC § 2509) (recognizing potential exploitation of NMD land conveyors by attorneys). In this case, the provision does not violate Article XII by its terms but it does implicate this public policy. While Diamond drafted a lease which does not vest a long-term property interest in it, the lease does confer upon it a contract right which effectively, today, ties up Elizabeth's long-term prospects for the property in anticipation of the law changing.

For example, if Elizabeth was proffered the opportunity today to, at the end of the fifty-five year lease period, lease to another party for more than that which Diamond is paying, she would be unable to accept the more lucrative offer if the provision was enforceable. Because the property is now encumbered by paragraph 21, Elizabeth's ability to alienate her interest in the land to a third party, distribute possession of the land by the customary law of partida, or use the land as collateral is hampered.

## CONCLUSION

Based on the foregoing, I would reverse the Superior Court's grant of a partial summary judgment in favor of Elizabeth Matsunaga and remand this matter to the Superior Court for further proceedings.